Argued September 8, 1977, reargued December 5, affirmed
December 29, 1978

BURNETTE, *Appellant,*
*v.*
WAHL, *Respondent.*
(TC 75-2L, SC 25069)

WAHL et al, *Appellants,*
*v.*
WAHL, *Respondent.*
(TC 75-1L, SC 25123)

CHOCKTOOT, *Appellant,*
*v.*
KIRK, *Respondent.*
(TC 75-16L, SC 25028)

588 P2d 1105

[ 705 ]

David L. Slader, Metropolitan Public Defender, Portland, argued the cause and filed briefs for appellants.

Enver Bozgoz, Klamath Falls, argued the cause and filed a brief for respondent Wahl.

No appearance for respondent Kirk.

HOLMAN, J.

Tongue, J., concurred and filed opinion.

Lent, J., concurred in part, dissented in part and filed opinion.

Linde, J., dissented and filed opinion in which Lent, J., joined.

## HOLMAN, J.

Three identical cases have been consolidated for appeal. Plaintiffs are five minor children aged two to eight who, through their guardian, are bringing actions against their mothers for emotional and psychological injury caused by failure of defendant-mothers to perform their parental duties to plaintiffs. Plaintiffs appeal from orders of dismissal entered after demurrers were sustained to the complaints and plaintiffs refused to plead further.

The complaints allege that plaintiffs are in the custody of the Children's Services Division of the Department of Human Resources of the State of Oregon and are wards of Klamath County Juvenile Court.

The complaints are substantially identical, each one being in three counts. Among these counts are strewn various allegations of parental failure upon which the causes of action rest. They are:

"1. Since [date], defendant intentionally, wilfully, maliciously and with cruel disregard of the consequences failed to provide plaintiff with care, custody, parental nurturance, affection, comfort, companionship, support, regular contact and visitation.

"2. She has failed in violation of ORS 109.010[1] to maintain plaintiff, who, due to * * * age and indigency, is poor and unable to work to maintain * * * self.

"3. She has abandoned plaintiff by. deserting the child with intent to abandon * * * and with intent to abdicate all responsibility for * * * care and raising, in violation of ORS 163.535.[2]

---

[1] "ORS 109.010 Duty of Support. Parents are bound to maintain their children who are poor and unable to work to maintain themselves; and children are bound to maintain their parents in like circumstances."

[2] "ORS 163.535 Abandonment of a Child. (1) A person commits the crime of abandonment of a child if, being a parent, lawful guardian or other person lawfully charged with the care or custody of a child under 15 years of age, he deserts the child in any place with intent to abandon it.

"(2) Abandonment of a child is a Class C felony."

[ 707 ]

"4. She has neglected the plaintiff by negligently leaving * * * unattended in or at a place for such period of time as would have been likely to endanger the health or welfare of the plaintiff, in violation of ORS 163.545.[3]

"5. She has refused or neglected without lawful excuse to provide support for plaintiff, in violation of ORS 163.555.[4]

"6. Defendant has maliciously, intentionally, and with cruel disregard of the consequences, deserted and abandoned her child.

"7. Defendant has alienated the affections of the plaintiff in that she has intentionally, wilfully and maliciously abandoned, deserted, neglected and failed to maintain regular contact or visitation, or to provide for the plaintiff and has deprived plaintiff of the love, care, affection and comfort to which plaintiff is entitled."

It is apparent that the first allegation is general in nature and is intended to be all-encompassing. The second, third, fourth and fifth allege violation of statutory duties in which abandonment and desertion comprise the central theme. The sixth allegation is one of abandonment and desertion purportedly based on common law. The seventh allegation is an attempt to allege alienation of affections. Although these allegations of parental failure allege lack of support and physical care along with affectional neglect, from the allegations of injury in the complaint and the statements made in plaintiffs' brief, it appears that the

---

3
"ORS 163.545 Child Neglect. (1) A person having custody or control of a child under 10 years of age commits the crime of child neglect if, with criminal negligence, he leaves the child unattended in or at any place for such period of time as may be likely to endanger the health or welfare of such child.

"(2) Child neglect is a Class A misdemeanor."

4
"ORS 163.555 Criminal Nonsupport. (1) A person commits the crime of criminal nonsupport if, being the parent, lawful guardian or other person lawfully charged with the support of a child under 18 years of age, born in or out of wedlock, he refuses or neglects without lawful excuse to provide support for such child.

"* * * * *.

"(3) Criminal nonsupport is a Class C felony."

injuries claimed are solely emotional and psychological.

Preliminary to a more detailed discussion, it should be noted that these claims of parental failure are different from those tort claims usually made upon behalf of children against parents. The adjudicated cases concern physical or emotional injuries resulting from physical acts inflicted upon children such as beatings and rapes, and from automobile accidents. Plaintiffs admit they can cite no cases permitting them to recover from their parents for solely emotional or psychological damage resulting from failure to support, nurture and care for them.

The legislature, recognizing the necessity of parental nurture, support and physical care for children, has enacted a vast array of laws for the purpose of protecting or vindicating those rights. These are much more extensive and all-inclusive than are those statutes alleged to have been violated in plaintiffs' allegations of tortious conduct.[5]

ORS ch 418 establishes extensive provisions for aid to dependent children, and it is under the provisions of this chapter and as wards of the juvenile court that plaintiffs are presently attempting to have their needs met. Most of the statutes cited in notes 1 through 5 deal with meeting children's physical needs, but plaintiffs' protection is not afforded solely by these laws. ORS 418.015 provides:

---

[5] Among these laws are ORS 108.040, providing an action against both parents for family necessities; ORS 108.110 *et seq.,* which allow a petition for the support of children to be brought against a parent by the other parent or a state agency for the support of the children; ORS ch 110, providing both criminal and civil means for reciprocal enforcement between states of the right of support for children; ORS 411.120(4), providing for assistance to dependent children; ORS ch 416, establishing the relative responsibility law (specifically see ORS 416.090, 416.100, and 416.220 for the means of enforcement); ORS ch 418, providing for child welfare services (specifically see ORS 418.135(1) and 418.460, concerning enforcement of parental duties); ORS ch 419, establishing juvenile courts (specifically see ORS 419.513, 419.515, and 419.517 concerning enforcement of support of children by parents).

"(1) The Children's Services Division may, in its discretion, accept custody of children and may provide care, support and protective services for children who are dependent, neglected, mentally or physically disabled or who for other reasons are in need of public service.

"(2) The Children's Services Division shall accept any child placed in its custody by a court under, but not limited to ORS chapter 419, and shall provide such services for the child as the division finds to be necessary."

"Care," "protective services" and "such services for the child as the division finds to be necessary" are all terms which include emotional nurturing as well as physical care. This reading of the statute is reflected in the Children's Services Division's publication entitled, "Permanent Planning for Children in Substitute Care" (1977).

We recognize that this is not a proceeding to secure parental nurturing, support and physical care for plaintiffs, but rather an action for psychological injury claimed to have been caused by the absence of these services. However, the statutory enactments demonstrate that the legislature has put its mind to the deprivations of which plaintiff children are alleged to be victims and has attempted to remedy such situations by enacting a vast panoply of procedures, both civil and criminal, to insure that children receive proper nurturing, support and physical care. It has never undertaken to establish, however, a cause of action for damages for any emotional injury to the child which may have been caused by a parent's refusal to provide these services. This failure of the legislature to act is significant because this is not a field of recovery which has heretofore been recognized by courts, and it would therefore be natural for it to have provided such a remedy if it thought it was wise in view of the social problem it attempts to solve and the statutory provisions it has enacted for that purpose. It has had no difficulty in the past in creating

new causes of action for persons aggrieved by conditions which it is attempting to rectify. Examples are the creation of causes of action, including punitive damages, in aid of enforcing ethics in the marketplace, ORS 646.638; actions for compensatory and punitive damages for unlawful discrimination by places of public accommodation, ORS 30.680, and by employers, ORS 659.030 and 659.121; and actions for double and triple damages for timber trespass, ORS 105.810 and 105.815.

■ The establishment by courts of a civil cause of action based on a criminal or regulatory statute is not premised upon legislative intent to create such an action. It is obvious that had the legislature intended a civil action it would have provided for one, as legislatures many times do.[6] Therefore, the underlying assumption is that it was not intended that the statute create any civil obligation or afford civil protection against the injuries which it was designed to prevent. When neither the statute nor the common law authorizes an action and the statute does not expressly deny it, the court should recognize that it is being asked to bring into existence a new type of tort liability on the basis of its own appraisal of the policy considerations involved. If a court decides to create a cause of action for the act or omission which violates the statute, the interest which is invaded derives its protection solely from the court, although the legislative action in branding the act or omission as culpable is taken into consideration by the court in deciding whether a common law action should be established. If

---

[6]See Prosser, The Law of Torts 191, § 36 (4th ed 1971), in which it is stated:

"* * * Where the statute merely declares that conduct is a crime, and makes no mention of any civil remedy, justification becomes more difficult, since the court is then obviously under no compulsion to apply the statute. Many courts have, however, purported to 'find' in the statute a supposed 'implied', 'constructive', or 'presumed' intent to provide for tort liability. In the ordinary case this is pure fiction concocted for the purpose. The obvious conclusion can only be that when the legislators said nothing about it, they either did not have the civil suit in mind at all, or deliberately omitted to provide for it."

[ 711 ]

a civil cause of action based upon a statute is established by a court, it is because the court, not the legislature, believes it is necessary and desirable to further vindicate the right or to further enforce the duty created by statute.

■ Because it is plain to the legislature that it could have created the civil liability and it has not, courts must look carefully not only at the particular statute establishing the right or duty but at all statutes which might bear either directly or indirectly on the legislative purpose. If there is any chance that invasion into the field by the court's establishment of a civil cause of action might interfere with the total legislative scheme, courts should err on the side of non-intrusion because it is always possible for the legislature to establish such a civil cause of action if it desires. Courts have no omnipotence in the field of planning, particularly social planning of the kind involved here. Courts should exercise restraint in fields in which the legislature has attempted fairly comprehensive social regulations.

There is no doubt but that the statutory provisions previously cited show a strong state policy of requiring the kind of parental nurturing, support and physical care of children which the defendants here are alleged to have denied their children. As previously indicated, it does not follow as a matter of course that it would be wise or judicious to vindicate that policy by a tort action for damages by children against their mothers. The state also has other policies within its statutory plan of which such a cause of action might well be destructive, particularly the policy of reuniting abandoned children with their parents, if possible. This policy is demonstrated by ORS 418.485, which states that "it is the policy of the state of Oregon to strengthen family life and to insure the protection of all children either in their own homes or in other appropriate care * * *." This same policy is even evident in ORS 418.745, in such a serious matter as physical child abuse, which states it to be "facilitating

the use of protective social services to prevent further abuse, safeguard and enhance the welfare of abused children, and preserve family life when consistent with the protection of the child by stabilizing the family and improving parental capacity, * * *." Also, as part of the Oregon Juvenile Code, we find ORS 419.474(2), which states that the provisions of the Act "shall be liberally construed to the end that a child coming within the jurisdiction of the court may receive such care, guidance and control, preferably in his own home, as will lead to the child's welfare * * *."

It is recognized by the statutory scheme that in some instances the reestablishment of a biological family is impossible and it therefore provides for a proceeding to terminate parental rights in order that a new family unit for the child may be formed. The section providing for parental termination, ORS 419.523, contains the following language in subsection (2) which demonstrates the importance which the legislature puts upon the establishment of the child in the home with its natural parents:

> "The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child *and integration of the child into the home of the parent or parents is improbable in the foreseeable future* due to conduct or conditions not likely to change * * *." (Emphasis added.)

The statute further provides that the court shall, among other things, consider the following in determining whether to terminate the parents' rights:

> "(e) Lack of effort of the parent to adjust his circumstances, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

[ 713 ]

What emerges is a comprehensive plan to furnish children in the position of these plaintiffs with parental nurturing and physical care, preferably in family units with their parents. If this is not possible, it provides for means of divesting parental rights so that a new family unit may be created for the child.

It could be contended that the criminal statutes are inconsistent with such a plan. However, no plan established by the legislature over a period of years can ever have perfect symmetry. Also, the legislature is undoubtedly aware that, for obvious reasons, parents of dependent children are not prosecuted criminally if there is hope of establishing the family unit.

■ It is significant that plaintiffs' complaints do not allege that proceedings for the termination of the defendants' parental rights have taken place. In such circumstances, it would be exceedingly unwise for this court to step in and to initiate a new and heretofore unrecognized cause of action in a field of social planning to which the legislature has devoted a great deal of time and effort in evolving what appears to be an all-encompassing plan. Those persons designated by statute for aiding the plaintiffs in these cases have not yet taken the step for which the plan provides when there is no longer any hope of reestablishing these children in a family unit with their mothers. Tort actions such as the present ones might well be destructive of any plans the social agencies and the juvenile court might have for these children. It is inappropriate for this court to insert a new cause of action into the picture.[7]

An exhaustive search of the legal literature finds only one article dealing with a right of action by children for emotional damage caused by ineffectual

---

[7]The dissenting opinions take this opinion to task because it is claimed the rationale is broad enough to encompass claims against parents for physical injuries. Because no physical injuries are involved, it is unnecessary for the purposes of this opinion to determine whether there are reasons why its rationale should or should not be applicable to physical injuries.

parents: *The Rights of Children: A Trust Model,* 46 Fordham L Rev 669 (1978). It suggests an analogy to the broad equitable principles of trust law as a model for defining the rights and duties existing among the child, his parents and the state. Even such a radical departure from present views does not advocate an action for money damages such as the present one. After a discussion of rights of action against third parties for the benefit of children who have been deprived of the nurturing and physical care of a parent by the acts of such third parties, the authors say:

> "* * * Unlike the remedy of money damages sought as compensation for loss of parental care in actions for alienation of parental affections, remedies more appropriate to the character of the right could be fashioned in emotional nurturing actions, such as psychological care and follow-up to overcome an inadequate capacity for emotional parenting. While the state cannot enforce love, it can reinforce it by providing social services which encourage formation or maintenance of parent-child ties." *Id.* at 732.

This state has provided appropriate remedies, as suggested by the article. The article further says, at 739, "The possibility of a monetary recovery for lack of nurturing should be limited to adult plaintiffs." While our position does not purport to be one of approval or disapproval of the positions asserted by the authors, the article demonstrates that even those who advocate radical changes in our method of thinking concerning the rights of children do not endorse actions such as those asserted here. Plaintiffs are unable to point to any literature in the field of child care or family planning which advocates an action for money damages to vindicate a right of the kind asserted here.

■ In addition, there is a limitation to the extent to which use may be made of tort actions for the purpose of accomplishing social aims. If there is ever a field in which juries and general trial courts are ill equipped to do social engineering, it is in the realm of the emotional relationship between mother and child. It is

best we leave such matters to other fields of endeavor. There are certain kinds of relationships which are not proper fodder for tort litigation, and we believe this to be one of them. There are probably as many children who have been damaged in some manner by their parents' failure to meet completely their physical, emotional and psychological needs as there are people. A tort action for damages by emotionally deprived persons against their parents is, in our opinion, not going to solve the social problem in the same manner in which the legislature is attempting to solve it.

■■ In addition to the contention that defendants should be liable for civil damages because of their violation of criminal and regulatory statutes, plaintiffs also contend that defendants are responsible because of the infliction of severe emotional distress by intentional acts. Plaintiffs allege that defendants intentionally deserted and abandoned them; however, they do not contend that defendants deserted them for the purpose of inflicting emotional harm upon them. We recognize that this tort usually also encompasses the infliction of emotional harm under circumstances from which a reasonable person would conclude that harm was almost certain to result. We believe this latter rationale is inapplicable as between parents and children. If it were otherwise, the children of divorced parents would almost always have an action for emotional damage against their parents. Divorce has become a way of life with almost certain emotional trauma of a greater or lesser degree to the children from the legal dissolution of the family and the resultant absence of at least one of the parents and sometimes of both.

■ In addition, plaintiffs contend that the common law tort of alienation of affections is applicable. They argue that because such a cause of action is intended to compensate one spouse for the intentional alienation of the other spouse's affections by a third party, and that because in one case, *Daily v. Parker,* 152 F2d 174 (7th Cir 1945), this cause of action has been

extended to the children, it should exist against the parent himself. The statement of the argument is its refutation. Also, the tort of alienation of affections has recently been abolished by the legislature, Oregon Laws 1975, ch 562, § 1.

■ Plaintiffs generally contend that without respect to previously recognized theories of recovery, we should recognize a new tort of parental desertion. For all the reasons previously given in declining to use recognized theories of recovery, we also decline this invitation.

The judgment of the trial court is affirmed.

**TONGUE, J.,** concurring.

Although I agree with much of the dissent and, for that reason, disagree with much of the reasoning of the majority opinion, I concur in the result reached by the majority. The doctrine of intrafamily tort immunity has been previously abandoned by this court with respect to intentional torts resulting in physical injuries. In my opinion, however, it does not follow that the doctrine should also be abandoned with respect to intrafamily torts resulting in "mental and emotional injuries" for reasons stated by the majority, although not in the context of intrafamily tort immunity.

**LENT, J.,** concurring in part; dissenting in part.

I agree with the majority that the asserted cause of action for alienation of affections must fall. I further agree with the majority that from a technical, pleading standpoint plaintiff (I shall speak of the plaintiffs and defendants in the singular) has failed to state a cause of action for "outrageous conduct" for failure to state that defendant intended to cause the severe emotional distress described in the complaint.

In dissenting, I have joined in the dissent of Linde, J. but desire to add some additional reasons for finding that a civil cause of action for damages should obtain.

The majority seems to take the position that what it finds to be a comprehensive legislative scheme is sufficient unto the evil of the day. I do not agree with that position and the limited condemnation of the defendant's conduct found in that legislative scheme.

The community has still other interests in condemning defendant's conduct and compensating plaintiff's injuries. At present there are over one-third of a million children in the United States who are dependent upon the community for their parental care.[1] In Oregon during fiscal year 1976-77 the number of dependent children was over 6,000.[2] The future is bleak for the vast majority of these children, at least those in the position of the plaintiff, whose parents have abandoned them permanently.[3] Only approximately five percent of such children are ever adopted and placed in a permanent parental situation.[4]

---

[1] This figure is based on a projection of the figures and growth rates given by Subcommittee on Children and Youth, Senate Committee Labor & Public Welfare, 9th Cong., 1st Sess., Foster Care and Adoptions: Some Key Policy Issues, 7 (Committee Print 1975) [hereinafter Senate Committee]. As of 1971, there were 330,373 children in foster care. This figure includes 260,430 in foster families, 5,640 in group homes, and 64,303 in institutions. The growth rate, when adjusted for population increase, is approximately 2.4% per year.

[2] See Children's Services Division, Trends 4-27 (August 1977). This figure includes approximately 3,600 children in foster care, 224 in shelter care, 103 in family group care, 65 in shelter evaluation centers, 78 in independent living, 440 in private agencies, 287 in child care centers, 136 in child study and treatment centers, and 1,280 in the juvenile correction system.

[3] In a study of foster care and its costs in New York City, Fanshel and Shinn, "Dollars and Sense in the Foster Care of Children," (Child Welfare League, 1972) [hereinafter Dollars and Sense], it was reported that approximately 42% of dependencies resulted from the voluntary act of the mother. These include:
Unwillingness of mother to assume parental duties—9.1%
Abandonment and desertion—12.5%
Neglect and abuse—17.4%
Unwillingness of mother to continue parental duties—2.9%

[4] R. Geiser, The Illusion of Caring—Children in Foster Care, 81 (1973). Maas and Engler, in their seminal work, Children in Need of Parents (1959), indicated that a very small percentage of such children are "readily adoptable"—less than five years old, white, of average or above average intelligence, and with no severe physical or personality problems. Id. at 383.

The costs—in dollars and cents—of taking care of these children is staggering. In 1972, the total cost at all levels of government was 712.5 million dollars.[5] The present cost may be estimated at approximately 800 million dollars.[6] In Oregon the Children's Services Division budget for the 1977-1979 biennium to provide "family services" for dependent children is over 43 million dollars.[7]

It is estimated that the total direct cost to the community of foster care in 1972 for a child from the age of one to eighteen was $122,500.[8] This is about five times the cost of raising a child in a low-budget family situation.[9] In Oregon the cost of foster care is approximately $200 per month per child.[10] Other types of dependent child care cost as much as $978.57 per child per month.[11]

However, the dollars-and-cents picture is not complete, since it measures only the direct, monetary loss to the community. Indirect costs are those which result from the *effects* of prolonged foster care—delinquency, economic dependency, crimes and corrections. Possibly the greatest costs are those which cannot be measured by dollars and cents at all—the loss in human potential. This latter cost to the community can best be stated in the words of those who have done the pioneering research on this subject.[12]

[5] Senate Committee, *supra* n.1 at 18. Additional costs include 119 million dollars a year for "homemaker services" and 65:8 million dollars for adoption services. *Id.*

[6] This figure is calculated using a growth rate of 2.4% per year, which does not account for inflation of costs.

[7] State of Oregon, Executive Department, Budget, Children's Services Division, Family Services, 119.

[8] Dollars and Sense, *supra* n.3 at 20. Per diem rates in 1970 ranged from $10.08 per child for foster family care to $20.52 per child in group residences. *Id.* at 8.

[9] *Id.* at 21.

[10] Children's Services Division, *Trends* 5 (August 1977).

[11] *Id.* at 24 (per diem costs for Child Study and Treatment Center).

[12] A representative bibliography (as of 1975) is given in Senate Committee, *supra* n.1 at 40-41.

All researchers report the psychological phenomenon known as "separation trauma," the trauma produced by the initial separation from the mother regardless of the circumstances of the case.[13] A second element noted by researchers is the development of ambiguous relationships by the dependent child, with a concomitant loss of self-identity.[14] A third general phenomenon found by the researchers stems from the instability of the foster care system itself, where multiple placements are the norm. This instability in relationships fosters personality disturbance.[15]

The general results of these factors have been summarized in two of the major works in the field. Maas and Engler[16] state:

> "These are the children who learn to develop shallow roots in relationships with others, who try to please but cannot trust, or who strike out before they can be let down. These are the children about whom we are most concerned."

And the authors of the influential work Beyond the Best Interests of the Child state:[17]

> "Only a child who has at least one person whom he can love, and who also feels loved, valued, and wanted by that person, will develop a healthy self-esteem. He can then become confident of his own chances of achievement in life and convinced of his own human value. Where this positive environmental attitude toward an infant is missing from the start, the consequences become obvious in later childhood and adult life. They take the form of the individual's diminished care for the

---

[13] *See e.g.,* Mnookin, *Foster Care—In Whose Best Interests?,* 43 Harvard Educational Review 599, 623 (1973) and studies cited therein. The risk of harm to the child from separation trauma is "substantial," especially for those separated at ages six months to three years, at approximately six years of age, and at puberty. *Id.* at 624.

[14] *Id.* at 625.

[15] *Id. See also* H. Maas and R. Engler, Children in Need of Parents 422 (1959) [hereinafter Children in Need].

[16] Children in Need, *supra* n.15 at 356.

[17] J. Goldstein, A. Freud and A. Solnit, Beyond the Best Interests of the Child 20 (1973) [hereinafter Beyond the Best Interests].

well-being of his own body, or for his physical appearance and clothing, or for his image presented to his fellow beings. What is damaged is his love and regard for himself, and consequently his capacity to love and care for others, including his own children."

While indirect monetary costs to society are more difficult to document and quantify, they are just as real. Maas reports that forty to fifty percent of the foster children involved in his study exhibited symptoms of maladjustment.[18] Eisenberg reports that the referral rate for psychiatric services for foster children is thirty per one thousand population, about ten times that of the general population.[19] Meier reports a higher than normal incidence of marital breakdown and illegitimate births among former foster children.[20] Finally, McCord reports that "a significantly higher proportion of those who had been placed in foster homes had criminal records in adulthood" when compared to a control group of potentially delinquent boys living at home.[21]

The authors of Beyond the Best Interests of the Child amply summarize the effects of parentless dependency on different age-group children and relate them to the costs to society:

"When *infants and young children* find themselves abandoned by the parent, they not only suffer separation distress and anxiety but also setbacks in the quality of their next attachments, which will be less trustful.[22]
"* * *

---

[18]Maas, Highlights of the Foster Care Project: Introduction, 38 Child Welfare 5 (1959), cited in Mnookin, *supra* n.13 at 623 and n.87.

[19]Eisenberg, The Sins of the Fathers: Urban Decay and Social Pathology, 32 American Journal of Orthopsychiatry 14 (1962). *See also* Mnookin, *supra* n.13 at 623, n.86.

[20]Meier, Current Circumstances of Former Foster Children, 44 Child Welfare 192-206 (1965).

[21]McCord, McCord and Thurber, the Effects of Foster-Home Placement in the Prevention of Adult Anti Social Behavior, 34 Social Science Review 415-420 (1960).

[22]Beyond the Best Interests, *supra* n.17 at 33.

"Resentment toward the adults who have disappointed them in the past makes [*school age children*] adopt the attitude of not caring for anybody; or of making the new parent the scapegoat for the shortcomings of the former one. In any case, multiple placement at these ages puts many children beyond the reach of educational influences, and becomes the direct cause of behavior which the schools experience as disrupting and the courts label as dissocial, delinquent, or even criminal.[23]

"* * *

"*Adults* who as children suffered from disruptions of continuity may themselves, in 'identifying' with their many 'parents,' treat their children as they themselves were treated—continuing a cycle costly for both a new generation of children as well as for society itself."[24] (emphasis added)

The sum of the cost to the community—direct and indirect, monetary and intangible—cannot be computed with complete accuracy; however, Maas and Engler summarized their findings as follows:[25]

"Adequate care of children is not inexpensive. It is just as costly to mend a child emotionally crippled by disorganized family life as it is to cure the crippled leg of a child stricken with polio. For children in need of parents the community will pay the price sooner or later. The high incidence of mental disorders, criminality, or at best economic dependency among adults who as children had lived in the limbo of foster care, is clear evidence of this."

It might be added that experts in the field of abandoned children have found this emotional damage to be real and important, however difficult it may be to measure. We heed the words of the authors of Beyond the Best Interests of the Child, who state:[26]

---

[23] *Id.* at 34. *See also id.* at 34, n2, which quotes extensively from the case history given in *Carter v. U. S.,* 252 F2d 608 (DC Cir 1957).

[24] Beyond the Best Interests, *supra* n.17 at 34.

[25] Children in Need, *supra* n.15 at 397.

[26] J. Goldstein, A. Freud and A. Solnit, Beyond the Best Interests of the Child 4 (1973).

[ 722 ]

"While they [legal decision makers] make the interests of a child paramount over all other claims when his physical well-being is in jeopardy, they subordinate, often intentionally, his psychological well-being to, for example, an adult's right to assert a biological tie. Yet both well-beings are equally important and any sharp distinction between them is artificial."

In view of the costs, both tangible and intangible to society of caring for these dependent children who have well been termed the "orphans of the living"[27] and the character of defendant's conduct as admitted by the demurrer, I believe defendant should shoulder so much of the financial burden as her resources permit. Further, I would hold that the emotional harm which the demurrer admits plaintiff has suffered is such as the community should conclude is monetarily compensable. As stated in Justice Linde's dissent plaintiff has alleged a cause of action.

**LINDE, J.,** dissenting.

With due respect, I cannot subscribe to the court's opinion.

The simple issue before us is whether a young child who allegedly has suffered severe mental and emotional injuries as a result of being deserted and abandoned by a parent acting "maliciously, intentionally, and with cruel disregard of the consequences"— conduct which the legislature has declared to be a crime—may upon proper proof hold the parent responsible in damages for these severe mental and emotional injuries. Contrary to the majority opinion, I believe that these allegations, which plead a violation of ORS 163.535, state a claim on which a child so injured may go to trial.[1]

---

[27] Children in Need, *supra* n.15 at 380.

[1] ORS 163.535:

    (1) A person commits the crime of abandonment of a child if, being a parent, lawful guardian or other person lawfully charged with the

In reaching this conclusion, I differ with the majority's treatment of its two crucial premises: (1) the source of civil liability for violation of criminal laws, and (2) the significance to be accorded to Oregon's child protection laws.

*Liability for damages from prohibited conduct.* It should be noted at the outset that awarding civil damages for violations of prohibitory laws is not an uncommon or radical theory of recovery. The question when the victim of criminal or otherwise prohibited conduct may recover damages from the wrongdoer is increasingly important in many areas of law. In a number of recent cases the issue has occupied the United States Supreme Court and the federal courts, whose greater attention to statutory premises of liability probably reflects the fact that these courts are not empowered to formulate common law torts unrelated to the Constitution or laws of the United States. *See, e.g., Wheeldin v. Wheeler,* 373 US 647 (1963) (majority and minority opinions). Thus the Supreme Court has also referred to potential civil liability under state law as one factor in determining whether such liability arises implicitly from an act of Congress. *Cort v. Ash,* 422 US 66 (1975). Apart from these differences, however, federal and state courts face the same question when prohibitory legislation implies a civil liability toward those for whose protection the legislation is enacted and when it does not. The answer depends first on whether a legislative policy to allow or to deny a civil remedy can be discerned in the text or the legislative history of the statute. If neither can be discerned, then it depends on whether the plaintiff belongs to the class for whose special protection the

care or custody of a child under 15 years of age, he deserts the child in any place with intent to abandon it.

(2) Abandonment of a child is a Class C felony.

Since the complaint alleges at least one cause of action, the validity of the other theories of recovery contained in the complaint need not be considered in overruling the demurrer. *See, e.g., Chaney v. Fields Chevrolet Co.,* 264 Or 21, 27-28, 503 P2d 1239, 59 ALR3d 1199 (1972).

statute was enacted and whether the civil remedy would contribute to or perhaps detract from achieving the object of the legislation. *Cort v. Ash, supra, reaffirmed in Piper v. Chris-Craft Industries, Inc.,* 430 US 1, 37-41 (1977).

This court has had a number of recent occasions to undertake this analysis. In *Davis v. Billy's Con-Teena, Inc.,* 284 Or 351, 587 P2d 75 (1978), we based potential liability for damages caused by unlawfully selling alcohol to minors on a stated legislative purpose to protect the safety and health of other persons beyond the minors themselves. In *Farris v. United States Fidelity,* 284 Or 453, 587 P2d 1015 (1978), on the other hand, we found that the statutory penalties provided for violations of the insurance code precluded inferring a damage claim for emotional suffering or punitive damages for the violation in question. *O'Toole v. Franklin,* 279 Or 513, 569 P2d 561 (1977), recognized that a knowing violation of a provision of the Oregon State Bar act could give rise to a damage action by a member of the class for whose protection it was enacted. And only this week we found in a prohibition against discharging an employee for claiming workers' compensation a public policy that supported a civil claim for damages by a worker so discharged. *Brown v. Transcon Lines,* 284 Or 597, 588 P2d 1087 (1978). The American Law Institute's Restatement (Second) of Torts, Tentative Draft No. 23, 1977, lists a number of other illustrations in its discussion of proscriptive or prescriptive statutes as sources of civil liability.[2]

---

[2] Restatement (Second) of Torts §874A (Tentative Draft No. 23, 1977):

3. A statute makes it a crime to have sexual intercourse with a previously chaste female under the age of 17, even though she factually consents. The court may hold that the tort action of battery will lie, regardless of the consent.

4. A federal act makes it a crime to intercept and divulge a telephone conversation. The court may "assimilate" this conduct to the torts of defamation and invasion of the right of privacy and grant damages.

. . . .

Sometimes a common law court will assimilate the statutory duty into an existing principle of liability, as for instance the negligence action in *Davis v. Billy's Con-Teena, supra,* but that is not always so. *See* Restatement (Second) of Torts, Tentative Draft No. 23, 1977, §874A, <u>Comment f.</u>[3]

Of course, the question of civil recovery for breach of a statutory duty can be an issue only when the legislation itself is silent on the point. If the legislature either provides for a civil remedy or clearly indicates that it means other provisions for enforcement to be complete and exclusive, there is nothing for a court to decide. It would help to clarify not only private rights but also the particular public policy if the legislative assembly as a routine step in the drafting of penal legislation faced the question of its civil consequences, or alternatively, if it were to enact a general formula for determining these consequences when a statute is otherwise silent.

Unfortunately legislatures do neither, but nothing can be inferred from that fact, given the existing

6. A statute makes it a crime to utter insulting and abusive language to another publicly. The court may hold that a civil action will lie, amounting to the intentional infliction of emotional distress.

. . . .

8. A statute makes it a crime to seduce a woman under promises of marriage. The court may hold that this conduct gives rise to a tort action for damages.

[3] As early as 1934, and until 1965, the original Restatement of Torts, §286, stated:

The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:

(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and,
(b) the interest invaded is one which the enactment is intended to protect; and,
(c) where the enactment is intended to protect an interest from a particular hazard, the invasion of the interests results from that hazard; and,
(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action.

practice of recognizing such consequences when the nature of the protective statute appears to imply them. The majority overstates the case when it equates legislative silence with an "underlying assumption . . . that it was not intended that the statute create any civil obligation or afford civil protection against the injuries which it was designed to prevent." Nor does it follow, when a court finds that the duty created or defined by the statute does imply a civil cause of action, that the court is engaged in pronouncing common law. The difference between a new common law theory of recovery in tort or otherwise and a civil claim based on a statute is obvious: The latter claim stands and falls with the statute from which it is implied, and it will disappear as soon as the amendment or repeal of the statute indicates a reconsideration of the previous public policy. Thus, while a court is often left at large to divine the implications of a statutory policy, it is equally an overstatement to say that the court simply makes its own judgment whether to "create a cause of action" deriving "solely" from the court's own appraisal whether additional protection for the claimed interest is "necessary and desirable."[4]

The relevance of criminal or regulatory laws to civil liability is more complex than merely being an element "taken into consideration by the court in deciding whether a common law action should be established," as the majority puts it. Such laws express

---

[4]Long ago, Chief Justice Harlan F. Stone deplored the reluctance of "modern courts [to] resort to standards of conduct set up by legislation" as sources of liability or other consequences beyond those provided by the legislation.

The statute was looked upon as in the law but not of it, a formal rule to be obeyed, it is true, since it is the command of the sovereign, but to be obeyed grudgingly, by construing it narrowly and treating it as though it did not exist for any purpose other than that embraced within the strict construction of its words. It is difficult to appraise the consequences of the perpetuation of incongruities and injustices in the law by this habit of narrow construction of statutes and by the failure to recognize that, as recognitions of social policy, they are as significant and rightly as much a part of the law, as the rules declared by judges.

Stone, *The Common Law in the United States,* 50 Harv L Rev 4 (1936).

distinct kinds of policies. First, the most familiar criminal laws are redefinitions of common-law crimes against private persons or property. They have equally familiar civil analogues in common-law torts. Only "victimless crimes" and crimes deemed to endanger the public as a collectivity, such as bribery, counterfeiting, or tax evasion, are likely to lack a corresponding civil liability. Violations of game laws or environmental protection laws may be other examples. Second, regulatory laws specify standards of socially responsible conduct for the protection of persons endangered by the conduct. While the tort standard may go further, we have recognized the force of the criminal or regulatory standard in negligence cases even when it was set by agencies or local governments that presumably could not themselves create civil liability whether or not they had such an intent. *See, e.g., Landolt v. The Flame, Inc.,* 261 Or 243, 492 P2d 785 (1972) (county building ordinance); *Stachniewicz v. Mar-Cam Corp.,* 259 Or 583, 488 P2d 436 (1971) (liquor control commission regulation). Third, governmental sanctions, penal or otherwise, may be enacted to add governmental enforcement to the recognized obligations of a relationship existing apart from the legislation. In such a situation the "underlying assumption," to use the majority's phrase, is hardly that the penal sanction makes the civil obligation unnecessary. Rather, the statute shows that the obligation is considered of such importance that it deserves enforcement by public prosecution.

*The child protection laws.* It can hardly be questioned that a statute like 163.535, which makes it a crime intentionally to desert and abandon a child, is of the third kind. It and the related sections did not enact a novel prohibition against parental neglect for the convenience of the general public or the protection of taxpayers. They enacted a legislative definition and public enforcement of certain minimal obligations of an existing relationship. Jurisprudentially it might be said that parents have a duty not to abandon and

[ 728 ]

desert their young children because ORS 163.535 makes it a crime to do so, but a legislator would surely think ORS 163.535 should make it a crime to abandon and desert a child because the parent's existing duty—the duty to the child, not to the state—deserved governmental reenforcement. It is the parent's duty thus recognized under Oregon law that plaintiffs invoke in these cases.

The majority does not really deny that ORS 163.535 constitutes such a legislative recognition and reenforcement of the parent's private obligation to the child, not of some socially convenient behavior. Rather, the majority would deny a remedy for the intentional breach of this obligation on the ground that other public policies militate against such a remedy. Upon examination, the majority's statutory citations refer to the single policy of maintaining and preserving the position of the child within a functioning family as long as this is possible. Without in any way questioning that this is indeed the state's public policy, I do not agree that it supports the conclusion that the legislature meant to deny the child a remedy for injuries from a parent's unlawful acts.

First, it must be kept in mind what conduct violates ORS 163.535. The statute makes it a felony to desert one's child with intent to abandon it. Of course, we have no evidence of the actual facts in these cases, but the allegations are that defendants did desert and abandon their children "maliciously, intentionally, and with cruel disregard of the consequences." If that is true, the parents have in fact ended the family unit, so that solicitude about not impairing it by litigation may sacrifice the children's legal rights to a pious hope. Contrary to the majority, I do not believe it is this court's own judgment of the possible effects of litigation on family relations that matters (a question on which counsel was unable to enlighten us and that, if taken seriously, is hardly within judicial notice) but rather what view of these effects may be attributed to the legislature. More important for interpreting the

legislative policy, however, the statute means that a district attorney or grand jury on the alleged facts could prosecute the parents for a felony. It is incongruous to hold that the legislature provided for a felony prosecution of parents who egregiously violate a duty toward their children, but that it meant to exclude civil actions on behalf of the maliciously abandoned children for fear of impairing the family unit. To hold that the plaintiffs cannot invoke this duty, one must assume a legislative policy that a deserted and abandoned child (or a guardian on its behalf) should ask a district attorney to seek the criminal punishment of the parent for this desertion, but that the child should have no claim that would be of any benefit to itself. That seems too unlikely a policy to attribute to the legislature without some showing that it was intended.

Moreover, the majority's premise proves too much. For purposes of the issue of law before us on these demurrers, it can be assumed that the plaintiffs have suffered actual, demonstrable injuries of a kind for which the law provides money damages against defendants other than parents, that defendants have assets from which these real injuries of the plaintiffs could be compensated, and that defendants caused these injuries by intentionally breaching a specific duty toward plaintiffs that is recognized in Oregon law. Perhaps the explanation for the majority's unwillingness to follow these assumptions to their conclusion is that the injuries alleged are psychological and emotional rather than physical. But if a civil remedy is denied on the majority's premise that it is precluded by a state policy of preserving family unity, that premise would apply equally to bar recovery of damages by a child crippled by physical abuse.[5] And despite the

---

[5]Defendant presented a "parade of horribles" such as actions for psychological or emotional injury from receiving fewer Christmas gifts than a sibling and the like. I note this only to point out that the argument misses the point. The nature of the *breach of duty* in this case is fixed by

majority's reference to statutory proceedings for the termination of parental rights, it is at least questionable that a termination proceeding would create rights to a financial recovery to compensate for such very real and costly harm caused before the termination proceeding.

Although the majority does not say so, its premise is the equivalent of the doctrine of intrafamily tort immunity which Oregon has abandoned at least with respect to intentional torts, *see Chaffin v. Chaffin,* 239 Or 374, 397 P2d 771 (1964); *Cowgill, Adm'r v. Boock, Adm'r,* 189 Or 282, 218 P2d 445, 19 ALR2d 405 (1950), though attributed here to a supposed legislative policy subordinating legal claims of children against their parents to reliance on "protective social services." I perceive no such prescribed reliance on social services when parents who have deliberately mistreated their children in a manner made criminal by statute have the assets to be responsible for the harm caused thereby. In my view, plaintiffs have alleged at least one triable cause of action arising from an alleged intentional violation of duties recognized in ORS 163.535. Therefore, the demurrers should have been overruled.

Lent, J., joins in this dissent.

---

ORS 163.535 and would not give rise to an expandable common law precedent. As far as the present issue is concerned, the case would be the same if a child had been deliberately abandoned in an unheated mountain cabin and lost a limb to frostbite or suffered other permanent injuries from lack of food or pneumonia.

Nothing is said here about claims based on other statutes invoked by plaintiffs that deal with general but unintentional neglect or nonsupport of children. The provision of alternative social services relied on by the majority may militate against implying a civil remedy for these less final and culpable violations of parental duty.