Argued and submitted October 14, 1996, affirmed March 19, 1997

Fidel Aguilar RAUDA;
Jose Saul Avalos Aguilar;
Oscar Aguilar; Maria Teresa Alvarado De Medina;
Refugio Bucio Martinez;
Martin Leon Martinez; Taurino Lopez Tenorio;
Tiburcio Ramirez Mendez;
Araceli Reyes Rosendo; Hermilio Romero Arzola;
and Silvestre Ruiz Mendez,
*Respondents,*

*v.*

OREGON ROSES, INC.,
*Appellant.*

(9410-75CV; CA A90331)

935 P2d 469

Barbee B. Lyon argued the cause for appellant. With him on the briefs were Jon P. Stride and Tonkon, Torp, Galen, Marmaduke & Booth.

D. Michael Dale argued the cause and filed the brief for respondents.

Joseph H. Hobson, Jr., filed the brief *amicus curiae* for Oregon Farm Bureau Federation.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

Warren, P. J., dissenting.

## EDMONDS, J.

Plaintiffs are former employees of defendant. They filed an action for damages alleging claims of wrongful discharge and breach of their employment contracts with defendant. Defendant moved to dismiss the complaint for failure to state facts sufficient to constitute a claim for relief. ORCP 21 A(8). The trial court denied defendant's motion to dismiss as to the claim for wrongful discharge but dismissed the claim for breach of an employment contract. Defendant, reserving the right to appeal the denial of its ORCP 21 A(8) motion, then stipulated to the entry of judgment in plaintiffs' favor on the wrongful discharge claim. Defendant now appeals from that judgment. We affirm.

For purposes of determining whether the trial court correctly decided defendant's ORCP 21 A(8) motion, we assume that the facts as pleaded in plaintiffs' complaint are true. *Sager v. McClenden*, 296 Or 33, 672 P2d 697 (1983). Plaintiffs allege that they are agricultural workers who were employed by defendant. They were informed by defendant that a new pay system would be implemented, based on a piece rate rather than an hourly wage. Plaintiffs were dissatisfied with the change in the method of pay and met with defendant's foreman. At that meeting, they expressed their dissatisfaction but ultimately agreed to the foreman's proposal that they work under the new pay system for a trial period. Thereafter, plaintiffs allege they were discharged from their employment because they collectively discussed their grievances about the new pay system with the foreman.

The legal question as framed by the parties is whether these allegations state a claim for common-law wrongful discharge or a claim of statutory violation. Because our holding regarding the claim of common-law wrongful discharge is dispositive, we do not address plaintiffs' alternative theory.

■ Generally, an employer may discharge an at-will employee at any time and for any reason, unless that act violates a contractual, statutory or constitutional requirement. *Patton v. J. C. Penney Co.*, 301 Or 117, 120, 719 P2d 854 (1986). To allege a claim of wrongful discharge, there must be

a discharge and that discharge must be wrongful. *McGanty v. Staudenraus*, 321 Or 532, 551, 901 P2d 841 (1995). The question is whether the discharge in this case was "wrongful" as that concept has developed in the context of the tort.

One exception to the general rule that an employer may discharge an at-will employee for any reason is that liability accrues if an employer fires an employee for pursuing a right related to his or her role as an employee and the right is one of important public interest as indicated by constitutional and statutory provisions and case law. *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 90, 689 P2d 1292 (1984). Plaintiffs contend that their right collectively to discuss their grievances with defendant's manager was an employment-related right of important public interest and that, inasmuch as their employment was terminated because they exercised that right, defendant is liable for a wrongful discharge. Defendant responds that the legislature has expressly excepted agricultural workers from certain statutory protection and that there is nothing in Oregon's labor laws that supports plaintiffs' theory that the termination of an at-will employment relationship under the facts of this case violates a right of important public interest.

Preliminarily, it is not absolutely necessary that a specific statute be violated or that conduct be the subject of regulation for a discharge from at-will employment to constitute a violation of public policy. *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 377-78, 879 P2d 1288 (1994), *rev dismissed* 321 Or 511 (1995). Rather, the proper focus is on whether a cognizable public policy that expresses a right of important public interest would be thwarted if an employer is allowed to discharge an employee without liability. *Nees v. Hock*, 272 Or 210, 219, 536 P2d 512 (1975). In the context of labor law, evidence of public policy for the most part is found in legislation enacted in the twentieth century. Accordingly, we turn to Oregon's statutes and other authorities to determine whether there exists in Oregon a public policy that protects agricultural workers from sanctions by employers for labor-related organizational activities.

In general, Oregon labor law is patterned after federal labor law. When the Oregon legislature adopts federal statutory language, federal legislative history and case law

pertaining to the language is persuasive when interpreting the policy of the Oregon statute. *McKean-Coffman v. Employment Div.*, 312 Or 543, 550, 824 P2d 410 (1992). Our survey of Oregon labor law begins with ORS chapter 661. ORS chapter 661, as originally enacted in 1919, was patterned after the Act of Congress approved October 15, 1914, 38 Stat ch 323, generally referred to as the Clayton Act. *Moreland Theatres v. M. P. Union*, 140 Or 35, 42, 12 P2d 333 (1932).

ORS 661.010 provides:

> "Working men and women may organize themselves into, or carry on labor unions for the purpose of lessening the hours of labor, increasing the wages, bettering the conditions of the members of such organizations or carrying out their legitimate purposes as freely as they could do if acting singly."

ORS 661.020 provides:

> "(1) The labor of a human being is not a commodity or article of commerce.
>
> "(2) The right to enter into the relation of employer and employee, to change that relation, to assume and create a new relation for employer and employee or to work and labor as an employee, shall be *held and construed to be a personal and not a property right.*"

Significantly, ORS chapter 661 does not exempt agricultural workers from its coverage. Its language appears to apply to *all* Oregon workers. As will become apparent later, the Clayton Act was similarly inclusive.

We turn to ORS 662.010 to ORS 662.130, first enacted in 1933. ORS 662.020 provides:

> "In the interpretation of ORS 662.010 to 662.130, and in determining the jurisdiction and authority of the courts of this state, as such jurisdiction and authority are defined and limited in those statutes, *the public policy of Oregon is declared as follows*: Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in a corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect the individual unorganized worker's freedom of labor and thereby to obtain acceptable

terms and conditions of employment, wherefore, though the worker should be free to decline to associate with the worker's fellows, it is necessary that the worker have full freedom of association, self-organization and designation of representatives of the worker's own choosing to negotiate the terms and conditions of employment and that the worker shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or *in other concerted activities for the purpose of collective bargaining or other mutual aid or protection*; therefore, the definitions of and limitations contained in ORS 662.010 to 662.130 upon the jurisdiction and authority of the courts of this state hereby are enacted." (Emphasis supplied.)

These statutes had their genesis in the Norris-La Guardia Act, 29 USC § 101 *et seq*, enacted by Congress in 1932. According to defendant, the Norris-La Guardia Act was Congress's "exasperated response" to limit the power of federal courts to issue injunctions in labor disputes, inasmuch as those courts narrowly construed the provisions of the Clayton Act. Defendant emphasizes, "The Norris-La Guardia Act did not make any *substantive* changes in labor law," and "although the Norris-La Guardia Act imposed restrictions on *courts*, it did not impose restrictions on anyone else." (Emphasis in original.) It follows then, according to defendant, that "Oregon's little Norris LaGuardia Act's" purpose was similarly limited.[1]

We disagree that the purpose of these statutes is as restricted as defendant asserts. In *City of Roseburg v. Roseburg City Firefighters*, 292 Or 266, 283, 639 P2d 90 (1981), the court said about ORS chapter 662:

"In 1933, the Oregon legislature recognized the interest of laboring people in organizing for their common welfare. *It did so in terms which left no question as to the importance of the interest and, although statutes regulating labor disputes have been modified over the years, the declaration of public*

---

[1] Defendant also relies on the following statement by the Oregon Supreme Court in *Wallace v. International Association of Mechanics*, 155 Or 652, 660, 63 P2d 1090 (1936):

"Since [the Oregon statute] and the [Norris-La Guardia Act] are substantially the same, we may reasonably assume that the legislature of this state had the same intention as had Congress in the enactment of such legislation."

*policy in ORS 662.020 remains unchanged since its adoption in 1933.*" (Emphasis supplied.)

Referring to the declaration of public policy in ORS 662.020, the Supreme Court also said in *Schwab v. Moving Pictures Operators*, 165 Or 602, 621, 109 P2d 600 (1941):

"The restraint imposed upon courts in the use of the injunctive process *was intended to aid working men in their efforts to reach a plane of bargaining equality with employers* by making their 'combination extend beyond one shop,' and so to raise the standards of wages and improve the working conditions throughout an entire industry.'" (Emphasis supplied.)

Finally, in *Wallace v. Int'l Ass'n of Mechanics*, 155 Or 652, 63 P2d 1090 (1936), the Supreme Court concluded that the "*right* of labor to organize and to engage in collective bargaining is now universally recognized." 155 Or at 662 (emphasis supplied).

Thus, as of 1933 the Oregon legislature had recognized that workers in Oregon had a right to enter into concerted labor activity and, under the law existing at that time, there was no express exception for agricultural workers. In that respect, the federal law was similar. One federal court observed:

"Although it is obvious that Congress's primary area of concern was industrial labor, there is nothing to suggest that any class of labor, be it agricultural, domestic or whatever, was intended to be excluded from the benefits of Norris LaGuardia. In this, it was like the Clayton Act, which had also made no distinction between different classes of labor." *Bodine Produce Inc. v. United Farm Workers Organization Committee et.al.*, 494 F2d 541, 548, (9th Cir 1974). (Footnote omitted.)

In 1935, Congress enacted the National Labor Relations Act (the NLRA). Under the NLRA, it is an unfair labor practice for an employer to discharge an employee for organizing with other employees. 29 USC § 158. The NLRA provides a procedure and an agency-administered process to address unfair labor practices. The NLRA excludes agricultural workers from its definition of "employees." 29 USC § 152(3). One contrast between the NLRA and the Clayton

and Norris-LaGuardia acts is evident, as the court in *Bodine* pointed out:

"The same [lack of distinction between classes of labor] cannot be said of the next relevant piece of legislation, the National Industry Recovery Act. Despite its broad language recognizing labor's right to organize and bargain collectively, there is evidence that Congress did not intend it to reach farmers and agricultural labor. In any event, both the Agricultural Adjustment Administration (AAA) and the National Recovery Administration (NRA) accepted the view that agricultural workers were not covered, differing only as to whether certain workers, such as packing-house workers were within the exclusion. This pattern was followed in the National Labor Relations Act, which specifically excluded agricultural laborers from its definition of 'employee.'

"Although there is little in the legislative history to explain this break with the inclusiveness of the Clayton and Norris-LaGuardia Acts, it is reasonable to conclude that it was done in an effort to accommodate the interests of labor and agriculture which, with respect to farm workers, inevitably were conflicting." *Id.* (Footnotes omitted.)

In 1961, the Oregon legislature enacted ORS chapter 663, which is patterned after the National Labor Relations Act. Similarly, ORS 663.005(3) excludes agricultural laborers from its definition of "employee." Relying on ORS 663.005(3) and the NLRA, defendant and the dissent argue that the public policy in Oregon is to exclude agricultural workers from any protected right to engage in self-organization or concerted labor activities. The decision of the Oregon legislature to except agricultural workers from ORS chapter 663 could mean that the legislature intended as they suggest. On the other hand, it could mean also that the legislature decided not to "regulate" agricultural workers who are engaged in labor activities with their employers.

We have been unable to discover any instructive legislative history regarding ORS 663.005(3) at the time of its enactment. In general, as defendant points out, ORS chapter 663 was intended to track the NLRA and regulate labor activities of smaller enterprises not governed by the NLRA. *See also* Testimony, House Judiciary Committee, HB 1043,

March 1, 1971, (statement of Senator Lent on a proposed amendment to what is now ORS chapter 663). We turn again to the legislative history underlying the NLRA. Congress believed that regulating agricultural workers would create administrative difficulties because, in part, of the transient nature of the work force. For instance, the legislative history underlying 29 USC § 152, states:

> "For administrative reasons, the committee deemed it wise not to include under the bill agricultural laborers, persons in domestic service or any family or person in his home or any individual employed by his parent or spouse." S Rep 573, 74th Cong., 1st Sess 7 (1935).

Additionally, the reason for the exclusion of certain classes of workers from the protection of the NLRA becomes more discernible when the issue arises in the context of federal preemption. For instance, in *Willmar Poultry Co., Inc. v. Jones*, 430 F Supp 573 (D Minn 1977), the issue was whether the NLRA preempted state regulation of the labor activities of agricultural workers. The court held that the NLRA's exclusion of agricultural workers did not preempt Minnesota's regulation of their labor activities. The *Willmar* court's ruling relied on the United States Supreme Court decision in *Hanna Mining Co. v. District 2, M.E.B.A.*, 382 US 181, 86 S Ct 327, 15 L Ed 2d 254 (1965). The plaintiffs in *Hanna* were involved in a labor dispute with a union about the organization of supervisory employees, another class of exempt employees under the NLRA. The Wisconsin Supreme Court had dismissed an action brought by the plaintiffs for lack of subject matter jurisdiction, holding that, while the union's activities were illegal under Wisconsin law, the dispute fell within the exclusive jurisdiction of the National Labor Relations Board. The United States Supreme Court reversed, holding that state jurisdiction was not preempted, because the NLRA, as amended in 1947 to exclude supervisory workers from the definition of "employees," did not apply to the supervisors. Relying on *Hanna*, the *Willmar* court held that the NLRA's exclusion of agricultural workers from its coverage did not preclude state protection of those same employees. Contrary to the dissent's assertion, Oregon's adoption of the NLRA in ORS chapter 663 does not imply that the legislature intended by its enactment to abrogate the

right of agricultural workers to engage in concerted activities for the reasons expressed by the *Willmar* court.

There is other evidence that suggests that at the time of the enactment of ORS chapter 663, the legislature affirmatively recognized the right of agricultural workers to organize. Also in 1961, the legislature enacted ORS 662.805 to ORS 662.825. These statutes make it unlawful for individuals other than regularly employed employees to picket or cause to be picketed any farm, ranch or orchard where perishable agricultural crops are produced *while such crops are being harvested*. Such a limitation suggests by implication that the legislature recognized that regularly employed agricultural workers had the right to engage in such concerted activities. There is nothing to suggest that that policy has changed since that time.

■       In summary, we are persuaded by our review of Oregon labor law that the inclusive language of ORS chapters 661 and 662 expresses a public policy that has always encompassed the protected right of all Oregon workers, including agricultural workers, to engage in concerted activities. The exception in ORS 663.005(3) for agricultural and other workers does not operate as an abolition of that right but as an exemption from regulation. Even though plaintiffs do not enjoy protection under ORS chapter 663, it does not follow that there is not a public policy in Oregon protecting their right to engage in concerted activities. Rather, as the Supreme Court has repeatedly reiterated, that right exists for all workers in the state, and an Oregon employer acts at its peril if it discharges its employees for such activities. To hold otherwise would be to thwart a substantial public policy of this state. Accordingly, the trial court did not err in denying defendant's ORCP 21 A(8) motion.

Defendant's other arguments do not require discussion.

Affirmed.

**WARREN, P. J.,** dissenting.

The National Labor Relations Act (NLRA) is the primary body of federal law controlling labor-management relations in private industry. 29 USC §§ 151-69. The defining

principle of the NLRA is found in section 7, which grants to employees the right to form labor organizations, to deal collectively through such organizations regarding terms and conditions of employment and to engage in concerted activities in support of these other rights. That exact same guiding principle is found in Oregon's ORS chapter 663, which is patterned after the NLRA:

> "Employees [shall] have the right to self-organization; to form, join or assist labor organizations; to bargain collectively through representatives of their own choosing; and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." ORS 663.110. (Bracketed text from federal statute.)

Before the enactment of the NLRA, however, employees who engaged in concerted activities in support of demands for higher wages and better conditions were without any legal protections or avenues of recourse in the event they were discharged. *See generally* Robert A. Gorman, *Basic Text on Labor Law* 1-2 (1976). What the NLRA and its Oregon companion, ORS chapter 663, did, was provide remedies for workers who were subject to what were defined under the statute as "unfair labor practices."[1] Under the statute, an employee who suffered an unfair labor practice could obtain redress through the Employment Relations Board (ERB), the administrative agency the legislature created to administer the act. Coverage under the statute, however, is only provided for individuals who are considered "employees," and individuals who are employed in "agricultural labor" are expressly excluded from that definition. ORS 663.005(3)(a).

Nonetheless, the majority explains, agricultural workers are only excluded from the benefits and protections of the NLRA and chapter 663 in the interests of administrative efficiency. 147 Or App at 114. The majority simply misses the point: the legislature has expressed, by necessary implication, a specific policy in its choice to exclude agricultural workers from coverage under chapter 663. That expression of legislative policy directly conflicts with the cause of

---

[1] For example, chapter 663 makes it an "unfair labor practice" for an employer to discharge an employee for organizing with other employees. *See, e.g.*, ORS 663.125.

action that the majority creates for agricultural workers here. It seems to me incongruous to expressly provide that it is not an unlawful labor practice to fire an agricultural worker for engaging in union activity and then, in the same breath, to say that we may nonetheless hold you liable under the common law if you do.

In this case, the majority has undertaken the task of fixing what it believes is bad law. We are not, however, in the position of second-guessing legislative policies. In an analogous situation, the Supreme Court in *Holien v. Sears, Roebuck & Co.*, 298 Or 76, 689 P2d 1292 (1984), stated:

> "The responsibility of this court is to apply and interpret the law, not to assume the role of a legislature chamber. As we said in *Burnette v. Wahl*, 284 Or 705, 712, 588 P2d 1105 (1978):
>
> " '* * * If there is any chance that invasion into the field by the court's establishment of a civil cause of action might interfere with the total legislative scheme, courts should err on the side of non-intrusion because it is always possible for the legislature to establish such a civil cause of action if it desires. Courts have no omnipotence in the field of planning, particularly social planning of the kind involved here. Courts should exercise restraint in the fields in which the legislature has attempted fairly comprehensive social regulations.' " *Id.* at 95-96.

Whether the statutes that the legislature promulgates embody the best or proper policy considerations is not for us to decide. And that is the majority's failing here.

For these reasons I dissent.