Argued and submitted December 15, 2003, affirmed April 27, 2005

Ah Young SHIN,
*Respondent,*

*v.*

SUNRIVER PREPARATORY SCHOOL, INC.,
a non-profit corporation,
*Appellant.*

SUNRIVER PREPARATORY SCHOOL, INC.,
a non-profit corporation,
*Third-Party Plaintiff,*

*v.*

Dong Eun SHIN,
*Third-Party Defendant.*

99CV0417MA; A114805

111 P3d 762

353-a

R. Daniel Lindahl argued the cause for appellant. With him on the briefs was Bullivant Houser Bailey PC.

Jeffrey M. Batchelor argued the cause for respondent. With him on the brief were Jennifer H. Holcomb and Markowitz, Herbold, Glade & Mehlhaf, PC, and William A. Barton, Kevin K. Strever and Barton & Strever, P.C.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

**ORTEGA, J.**

This case arises out of plaintiff's attendance at and eventual expulsion from defendant Sunriver Preparatory School (Sunriver Prep) when she was 17 years old. Plaintiff sued the school on various tort theories and prevailed after a jury trial. Sunriver Prep now appeals, asserting that the trial court erred (1) in denying the school a directed verdict on plaintiff's claim for negligent infliction of emotional distress; (2) in refusing to instruct the jury to compare the school's negligence with the fault of a third-party defendant intentional tortfeasor (plaintiff's father, Dong Eun Shin (Shin), who raped her while she was in the school's care); and (3) in concluding that plaintiff had a private right of action for the school's failure to report sex abuse under ORS 419B.010(1). We affirm as to the first two assignments of error; the parties agree that this disposition eliminates the need to address Sunriver Prep's third assignment.

■　　Because this case involves review of the denial of directed verdict motions, we consider the facts in the light most favorable to plaintiff, who prevailed before the jury. *See Seidel v. Time Ins. Co.*, 157 Or App 556, 561, 970 P2d 255 (1998).

Plaintiff was born and raised in Korea. In 1996, as a high school sophomore, plaintiff enrolled at Sunriver Prep, a private boarding school that enrolls about 140 students. A small number of those, including plaintiff, came from abroad as part of the school's international program. Most of the international students stayed at the school's International House, described in the parent-student handbook as a "dormitory-style home supervised by [the school's] faculty/parents." Other housing options, such as homestays, were "available at the school's discretion."

On her enrollment, plaintiff moved into the International House, where she and other resident students lived under a contract that provided that they were subject to their hosts' supervision "24 hours a day, 7 days a week." She was also subject to an enrollment contract that provided:

"The undersigned, on behalf of themselves and the above student, agree to accept the rules and regulations adopted by [Sunriver Prep]. [Sunriver Prep] reserves the right to discipline, suspend or dismiss any student whose behavior, performance, or progress, in the judgment of [Sunriver Prep], is deemed unsatisfactory or whose influence does not serve the best interests of [Sunriver Prep]. [Sunriver Prep] also reserves the right to dismiss any student whose parents' influence does not serve the best interests of [Sunriver Prep]."

In the middle of her junior year, with the approval of Patricia King, the head of the school, plaintiff and a German student moved into the home of Kim Wheeler, a part-time physics teacher at the school. Wheeler was given a copy of a "Homestay Agreement and Policy" (the homestay agreement), which purported to outline the "fundamental expectations and obligations" of the arrangement "in accordance with school policy and philosophy." After plaintiff moved in with the Wheelers, King gave the Wheelers a homestay orientation to explain what the school expected of homestay parents, including the areas covered by the agreement. King noted that plaintiff, who owned her own car, had been excepted from one rule against homestay students driving, but otherwise Wheeler understood that these were guidelines that the school expected would be followed. Wheeler, plaintiff, and her father later signed the homestay agreement.

The agreement covered virtually every aspect of plaintiff's life. For example, it provided that she could not leave campus during school hours without permission from her homestay parent and could attend only social activities that were supervised by an adult approved by the homestay parent. Plaintiff's homestay parent was required to know her whereabouts "at all times." Other details of plaintiff's day-to-day life were covered as well, including the hours in which homework was to be completed, strict curfew hours, restrictions against dating, and strict limits on when she could talk on the telephone and for how long. The homestay agreement also provided rules for resolving conflicts, calling for the parents' involvement only as a last resort, and required plaintiff's host family and her parents to agree to "work with

school personnel to solve any issues having to do with the student's happiness and performance in the host family's home or at school." Likewise, if plaintiff required medical care, her homestay parents were authorized to secure it and to inform her parents later. Not surprisingly, Wheeler described herself as plaintiff's "mom."

Shortly after plaintiff moved into her home, Wheeler noticed that plaintiff seemed depressed and took her to visit a family practitioner, Dr. Mary Meador. Plaintiff said nothing to indicate that she had suffered physical or sexual abuse but, according to Meador, was tearful and anxious, was having trouble sleeping, and was suffering from panic attacks. Meador prescribed a tranquilizer and an antidepressant to address those symptoms of acute depression.

Over the next two months, Wheeler noticed that plaintiff's depression seemed to deepen. Her parents were divorced, and plaintiff talked on the phone with her mother in Korea almost nightly. Afterward, she was often tearful and would comment on how much she missed her mother. After plaintiff talked to her father, Shin, however, she became upset, told Wheeler that she hated him, and withdrew. Wheeler sought insight from plaintiff's best friend, Jessica, about the behavior, and Jessica reported that there was "something going on" but would not be more specific.

Concerned, Wheeler engaged plaintiff in an evening of conversation, and plaintiff eventually disclosed that Shin had repeatedly beaten her, her brother, and her mother and had sexually abused plaintiff continually, beginning when she was four years old. Plaintiff feared that if any of this came out her mother's life would be in danger and conveyed to Wheeler that things were "very different" in Korea. Shin had legal custody of plaintiff at the time.

Wheeler knew that she must report to the authorities what she had learned—and she also knew that Shin shortly planned to visit Bend to take plaintiff on a 10-day business trip. Because King, the head of the school, was out of town, Wheeler called Dr. Carol Frost Lee (Lee), a physician who taught part time at the school and shared an interest in plaintiff. Lee counseled Wheeler to calm down and wait until morning before doing anything.

The next day, March 16, Wheeler again took plaintiff to see Meador, whom plaintiff had seen previously for depression. Meador observed that plaintiff had suicidal thoughts, but "no plan or intent * * * to carry that out." Plaintiff disclosed the long history of sexual abuse by her father, and Meador felt that Shin's upcoming business trip to the United States had exacerbated plaintiff's depression. At Wheeler's request, Meador agreed to prepare a letter to Shin, hoping to dissuade him from visiting plaintiff by informing him that she was too ill to travel.

That same day, Wheeler reported the abuse to the State Office for Services to Children and Families (SOSCF). Personnel there referred her to the KIDS Center, a division of the Deschutes County Mental Health Department that provides counseling and treatment in cases of child abuse and neglect. KIDS personnel told Wheeler to make an appointment for plaintiff to be evaluated and to call State Police Detective Lynn Fredrickson.

Plaintiff did not want to be counseled at KIDS. She was so frightened of the consequences of exposing her father that she told Wheeler she would just go on the trip with him so that she could stay in the United States. Wheeler managed to convince plaintiff to meet with KIDS therapist C. J. Anderson privately on March 18. Anderson later reported that plaintiff was having suicidal thoughts and felt that when Shin came, she would be "absolutely at his mercy." Still, according to Anderson, plaintiff was conflicted about her disclosure of sexual abuse and, when Anderson mentioned that the police would be notified, plaintiff refused to continue with the interview, though plaintiff later resumed contact with Anderson.

When King returned from her trip on March 18, Wheeler told her about plaintiff's situation and reported that she had called SOSCF. Wheeler felt that King showed no concern for plaintiff at all; she told Wheeler that she should not have gone to the authorities because plaintiff might have been lying. Worried that Shin would sue the school, King instructed Wheeler not to speak with anyone else, inside or outside the school, and was "irate" when Wheeler told her

that she already had an appointment to meet with Detective Fredrickson.

Wheeler met with Fredrickson the following day, March 19. However, Fredrickson could not act without a statement from plaintiff, who was too frightened to talk. Fredrickson told Wheeler that if Meador's letter did not deter Shin from visiting, Wheeler should call Fredrickson, and he would find "some way" to intercede, even if it meant putting plaintiff into protective custody. He gave Wheeler his telephone and pager numbers so that she could reach him any time, day or night.

Wheeler informed King of her conversation with Fredrickson. She and plaintiff also called Shin to explain that plaintiff was too ill to travel and then faxed him Meador's letter. However, the next day, the FBI called Wheeler and informed her that Shin was on an airplane bound for the United States. The agent said that they could detain Shin for only 12 hours, unless plaintiff was willing to press charges. Knowing that plaintiff would not and feeling hopeless, Wheeler told the agent not to detain Shin. She and her husband decided to protect plaintiff as best they could; they would act as if plaintiff was "a sick girl who needs lots of rest" and would "be on her like glue." Wheeler did not inform King of the plan because she felt that King was unsympathetic to plaintiff's situation. She also did not inform Fredrickson that Shin was headed to Bend; given that he was the only law enforcement officer she had spoken with up until the call from the FBI, Wheeler assumed (incorrectly) that the state police would know anything that the FBI knew.

On March 20, Shin called from Portland and asked plaintiff to pick him up at the Redmond airport. Wheeler at first refused to allow it, but when plaintiff explained that her father would be suspicious if she did not pick him up, Wheeler relented, telling plaintiff that she would call the police if plaintiff was not back within an hour. Plaintiff agreed. Later, plaintiff mentioned that she and her father had stopped at the hotel to check in, but when Wheeler questioned her, plaintiff denied any sexual contact. According to Wheeler, plaintiff seemed happy and talked with Shin that

evening until she and Sandra, the other homestay student, drove him back to his hotel.

Wheeler spent the entire next day with plaintiff and her father. On the third day, however, Wheeler gave in to Shin's angry demand that he take plaintiff shopping alone. When plaintiff returned, she denied having been molested. She dropped Shin off at his hotel that night and likewise denied later that any molestation took place. Shin took a cab to the airport early the next morning. Despite plaintiff's denials, Shin had indeed raped plaintiff on the three occasions when they were alone together.

About two weeks after Shin's departure, on April 5, plaintiff told Wheeler that she was feeling suicidal, and Wheeler took her to the hospital. Plaintiff had received several phone calls from Shin in which he threatened to remove her from Sunriver Prep, and plaintiff told Wheeler and the physicians and hospital staff that she was reacting to those threats, not to any recent sexual abuse. One of the physicians noted that it did not appear that plaintiff would really try to kill herself but that she was making a "cry for help." However, eventually plaintiff revealed to Dr. Hyde, one of the admitting doctors, the three recent occasions of sexual assault by her father. Wheeler also learned of those assaults and the next day, while plaintiff was still in the hospital, Wheeler decided that things had "gone far enough" and called plaintiff's mother, Jae Duck Kang, in Korea, urging her to come to the United States right away. Wheeler told plaintiff that her mother was coming, but did not tell plaintiff that she had disclosed to Kang the history of abuse that plaintiff had reported to Wheeler. Plaintiff made the same disclosure to her mother when Kang arrived in Bend a few days later.

Wheeler had not informed King of Shin's visit to Bend, which occurred during the school's spring break. (The record is unclear as to when King first learned of the visit.) But Wheeler did tell King that plaintiff had been hospitalized and that Kang had been called. King was angry that Wheeler had made the call rather than leaving that to King. King arranged to meet with Kang, Wheeler, and Pam Goldsmith,

the school's counselor, a few days later, on April 13. The purpose of the meeting was to obtain releases from Kang requiring plaintiff to go through counseling and giving King and Goldsmith "access to whatever was said in those counseling appointments." Kang signed four releases—one to Meador; one to Hyde; one to Anderson, the KIDS counselor; and one to Dr. Linda Miller, a clinical psychologist whom Sunriver Prep had retained to ensure that plaintiff had the benefit of ongoing therapy. Each release authorized the recipient to provide Goldsmith and Sunriver Prep with "everything regarding [plaintiff's] emotional, physical and family situation[,] * * * [including] test results, records[,] and any other relevant materials which may assist the counselor/school in their efforts to help evaluate [plaintiff's] needs."

After the meeting, Goldsmith called Anderson at KIDS and informed her that Sunriver Prep had arranged for plaintiff to see Miller for a psychiatric evaluation and for twice-a-week therapy. By that point, plaintiff had seen or conferred by telephone with Anderson four times and was scheduled to see her again the next day. Anderson told Goldsmith that it would not be appropriate for plaintiff to have dual therapists and that plaintiff, not Goldsmith, would have to "disengage our relationship" if Miller were to assume the role of plaintiff's therapist.

Moreover, plaintiff was upset that her mother had signed releases that gave Goldsmith such complete access to her personal information. She told Wheeler that she did not trust Goldsmith, who she believed had betrayed the confidences of other Sunriver Prep students.

Meanwhile, an SOSCF caseworker, Vickie Jones, was informed of the assaults that plaintiff had endured over spring break. Plaintiff agreed to meet with Jones at 3:00 p.m. on April 15. When Jones learned that Sunriver Prep had scheduled a noon appointment for Miller to evaluate plaintiff, Jones called Goldsmith to ask that the appointment be canceled until she could complete the initial SOSCF interview while plaintiff was finally willing to talk. However, Goldsmith refused, insisting that King, who was unavailable, had made the appointment and that only King could cancel

it. After Detective Fredrickson interceded, Goldsmith apparently agreed to cancel the Miller appointment, but only after suggesting to Fredrickson that plaintiff "had problems being truthful." (Apparently, plaintiff had once falsely denied that she smoked cigarettes and, on another occasion, had sneaked out of the International House so that she could attend school despite being ill, because "she was getting behind.")

Jones interviewed plaintiff at the KIDS center on April 15. The interview was videotaped, and Fredrickson watched and listened from another room as plaintiff recounted what her father had done three weeks before. The next day Fredrickson met with King and Goldsmith and reported the disclosures (leaving no dispute that by April 16 the school was aware of those events).

Also on April 16, Kang, with Wheeler's assistance, wrote to King requesting a retraction of the releases she had signed. She indicated that she would "reevaluate the situation" if plaintiff's counselor deemed that full disclosure was necessary. Kang left for Korea that same day, in part to attempt to change custody of plaintiff from Shin to herself.

Without exploring the possibility of a more limited release, King faxed a letter to Kang the next day informing her that plaintiff would be expelled from Sunriver Prep. The letter explained:

"Your retraction does not permit our [s]chool to be fully informed regarding [plaintiff's] needs, which we understand are serious in nature. Since [plaintiff] is a homestay student under the school's supervision, our being fully informed of such matters is critical to our having this responsibility for your daughter and her well[-]being. As a result, the [s]chool has been advised by legal counsel to terminate [plaintiff's] enrollment at the school and the homestay arrangement with * * * Wheeler. [Plaintiff] may no longer attend as a student at Sunriver [Prep] after today, April 17, and she may no longer remain in the homestay with * * * Wheeler after tonight.

"Immediate arrangements are being made to transport [plaintiff] home to you, leaving Saturday, April 18."

The same day, April 17, Wheeler was summoned to Goldsmith's office, where Goldsmith and King examined her

about her role in drafting the retraction letter. They informed her that, because of that letter, they were expelling plaintiff and sending her back to Korea. Wheeler was "appalled" that they were sending plaintiff back into the hands of her abuser, who had full custody of her, but when she protested, King told her they had "no choice." (King later testified that, at the time, she believed Kang, not Shin, had custody of plaintiff.)

King instructed Wheeler to pull plaintiff out of class and bring her to Goldsmith's office, where she would be informed of the expulsion. King proceeded to tell plaintiff that she was being expelled from school and "would be getting on the next plane back to Korea," as Wheeler recounts it; "[t]hey told [plaintiff] she needed to go get her stuff out of her locker and * * * then come back to [Goldsmith's] office where they would go ahead and take her to the airport and they would put her on a plane."

Wheeler and plaintiff retrieved plaintiff's things out of her locker and then, with King's permission, went home for lunch together. Wheeler immediately called Lee, the teacher-physician with whom she had spoken when she first learned of plaintiff's history with her father, to inform her of the school's actions. Lee met them at Wheeler's house, Wheeler left to run a business errand, and King and Goldsmith arrived shortly thereafter. Lee interceded on plaintiff's behalf, insisting that plaintiff was too upset to travel alone and that Lee would not allow it. When Lee persisted, King finally relented. King called plaintiff's mother, who had just arrived home in Korea, and they agreed that plaintiff would remain in Bend and spend the weekend with Lee and her husband, and that Kang would return to Bend on the following Monday, April 20. King also told Kang that she wanted another signed medical release.

When Wheeler returned home, King told her that she was to have no contact with plaintiff or her mother and that, if she insisted, she would lose her job. The next day, King left a voice mail message for Wheeler and delivered handwritten notes to Wheeler and Lee. The notes emphasized that plaintiff would not be allowed on campus, would not be allowed to participate in any school programs, and prohibited plaintiff and her mother from staying in Lee's home

after Kang arrived in Bend. The note to Wheeler emphasized that if she chose to house plaintiff and her mother, she would be fired and the students staying with her would have to be placed elsewhere. King's voice mail stressed that Wheeler's job was on the line, "because the school legally cannot have that kind of responsibility" for plaintiff.

That Monday, King distributed a memorandum to all the faculty indicating that plaintiff would "no longer attend" Sunriver Prep. The memo noted that "the school cannot provide for her safety and well-being" and that plaintiff's mother "wishes to come here rather than have [Sunriver Prep] send [her] back to Korea." During trial, King testified that plaintiff's expulsion was intended to be temporary, that it occurred only because of the "lack of appropriate releases," and that the potential existed for plaintiff to be reinstated if certain conditions were met. King testified that the memorandum was delivered to faculty not because the decision was final but because she was "skeptical" that "things would work out."

Four counselors testified at trial regarding the effect of the expulsion on plaintiff: Anderson, plaintiff's counselor at the KIDS Center; Dr. Reichert, the medical director at KIDS; Miller, the psychologist whom Sunriver Prep had retained for plaintiff; and Helena Unju Kim, who was herself born and raised in Korea and has experience working with children who are victims of sexual abuse. Anderson, who saw or spoke with plaintiff four times in the two weeks following plaintiff's expulsion, testified that the expulsion was a "very big piece of [plaintiff's] trauma." (Indeed, on May 11, Anderson wrote to King recommending that plaintiff be readmitted.) Reichert examined plaintiff once after the expulsion and reported that plaintiff was "very fragile" and at high risk for suicide, though not immediately suicidal; she felt that plaintiff's emotional state was caused by both the sex abuse and the expulsion. Miller, who apparently only learned of the expulsion at trial, said that the expulsion "would have been a really awful thing for [plaintiff] to endure." And Kim explained, based both on her examination of plaintiff and her understanding of Korean culture, that to plaintiff, expulsion from school meant "the end of her life."

Through the intervention of an attorney, plaintiff was allowed to return to Sunriver Prep a month later under certain conditions. Kang had to acknowledge that "Sunriver Prep is not a therapeutic school" and had to sign a "release, hold harmless, and indemnification agreement." Plaintiff had to live with Kang for the remainder of the school year and would not be allowed to return for her senior year.

The arrangement lasted for one day. Kang accompanied her daughter to class, but plaintiff found the experience too uncomfortable and stayed for only one class. She completed the year from an apartment in Bend, with the assistance of a tutor who ferried her assignments back and forth. Plaintiff continued her therapy with Anderson and graduated from another high school in Bend the following year.

Plaintiff sued Sunriver Prep on various negligence theories, asserting three claims for relief. First, she alleged that the school, through its agent, Wheeler, was negligent in failing to adequately supervise plaintiff during Shin's visit, resulting in his rape and sexual abuse of plaintiff. Second, plaintiff alleged that Sunriver Prep, again through its agent, Wheeler, failed to report the abuse to the authorities as required by ORS 419B.010. Finally, plaintiff asserted a claim for negligent infliction of emotional distress (NIED) against Sunriver Prep for the school's expulsion of plaintiff in a manner that defendant "knew or should have known" would, and did, cause plaintiff "grave mental distress."

The case was tried to a jury, which found for plaintiff on all three claims. Sunriver Prep presents an assignment of error on each of those claims. However, as mentioned above, the parties agree that affirmance on Sunriver Prep's second assignment of error (addressing the trial court's refusal to permit the jury to apportion fault between Sunriver Prep and Shin), obviates any need to address the third assignment (addressing the trial court's refusal to grant a directed verdict against plaintiff's claim based on the child abuse reporting statute). Our disposition accordingly requires us to address only the first and second assignments, which we do in turn.

Sunriver Prep's first assignment of error addresses the trial court's denial of a directed verdict on the NIED

claim, which was based on allegations that the school inflicted emotional distress on plaintiff by expelling her in a negligent manner. Sunriver Prep argued to the trial court that plaintiff's NIED claim was inadequate as a matter of law because plaintiff does not claim a physical injury and has not asserted that the school's actions affected any other legally protected interest. Plaintiff does not purport to allege a physical injury related to her claim but argued to the trial court that she did assert a legally protected interest arising from the special relationship between her and the school. The parties renew their arguments on appeal.

■     Where a plaintiff seeks redress for emotional injury alone, liability for negligence must have a legal source that goes beyond the common-law duty to exercise reasonable care to prevent foreseeable harm. *Hammond v. Central Lane Communications Center,* 312 Or 17, 22-25, 816 P2d 593 (1991) (relying on *Norwest v. Presbyterian Intercommunity Hosp.,* 293 Or 543, 558-59, 652 P2d 318 (1982)); *see also Delaney v. Clifton,* 180 Or App 119, 124, 41 P3d 1099, *rev den,* 334 Or 631 (2002); *Stevens v. First Interstate Bank,* 167 Or App 280, 286-87, 999 P2d 551, *rev den,* 331 Or 429 (2000). Even then, the legally protected interest so identified must be "of sufficient importance to warrant the award of damages for emotional distress." *Curtis v. MRI Imaging Services II,* 148 Or App 607, 620, 941 P2d 602 (1997), *aff'd on other grounds,* 327 Or 9, 956 P2d 960 (1998) (citing *Collver v. Salem Insurance Agency, Inc.,* 132 Or App 52, 66, 887 P2d 836 (1994), *rev den,* 320 Or 598 (1995), and *Hilt v. Bernstein,* 75 Or App 502, 515, 707 P2d 88 (1985), *rev den,* 300 Or 545 (1986)).

■     Certain types of special relationships in which one party owes the other a heightened duty of care, beyond the common-law duty to exercise reasonable care to prevent foreseeable harm, give rise to a legally protected interest sufficient to support the imposition of liability for purely emotional harm. *Curtis,* 148 Or App at 618-20 (relying on *Conway v. Pacific University,* 324 Or 231, 239-40, 924 P2d 818 (1996)). We conclude that the relationship between an international homestay student and a school, under the circumstances presented here, gave rise to such a heightened duty on the part of the school to protect the student from emotional harm and that the student's legally protected interest

is sufficiently important to support the imposition of liability for negligently causing emotional harm. Accordingly, the trial court correctly denied Sunriver Prep's motion for a directed verdict on plaintiff's NIED claim.

■ ■ We first address the nature of the relationship between the parties. Whether a relationship is special is driven by the facts. *Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 334, 39 P3d 903, *rev den*, 334 Or 190 (2002) (explaining that the cases undertake a "functional as opposed to a formal analysis" for determining whether a special relationship exists, based not on the name of the relationship but on the roles that the parties assume in the particular interaction at issue). For example, if an insurer undertakes to defend its insured against a third-party claim, the carrier assumes control of the defense and settlement negotiations and therefore stands in a special relationship with the insured. *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 110-11, 831 P2d 7 (1992). That kind of relationship carries with it a standard of care that exists independent of the insurance contract. *Id.* By contrast, where the insurer does not undertake the defense of the insured, the carrier does not assume the fiduciary duty that would result from having done so, and its responsibilities are confined to the contract terms. *Farris v. U.S. Fid. and Guar. Co.*, 284 Or 453, 460, 587 P2d 1015 (1978); *Warren v. Farmers Ins. Co. of Oregon*, 115 Or App 319, 324-25, 838 P2d 620 (1992), *rev den*, 316 Or 529 (1993).[1]

■ ■ As another example, where a creditor is also the debtor's agent for the purpose of raising funds to satisfy the debt, the creditor assumes fiduciary duties of care and loyalty to the debtor, even though the creditor-debtor relationship normally does not include fiduciary duties. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 616-17, 892 P2d 683 (1995). Similarly, a manufacturer-dealer relationship ordinarily is not special, because "a dealer does not generally place complete control of critical aspects of the dealer's person, property or economic interests in the hands of the manufacturer

---

[1] Accordingly, Sunriver Prep's argument that the parties' relationship was necessarily limited to the terms of the enrollment contract between plaintiff and the school is without merit.

* * *." *Eulrich v. Snap-On Tools Corp.*, 121 Or App 25, 36, 853 P2d 1350, *rev den,* 317 Or 583 (1993), *vacated on other grounds,* 512 US 1231, 114 S Ct 2731, 129 L Ed 2d 854 (1994). But the relationship *is* special "[i]f the parties construct an essentially fiduciary-type dependency relationship" so that the manufacturer owes the dealer duties independent of the contract. *Id.*

■     The common thread among special relationships—that is, those warranting a heightened duty of care—is that "the party who owes the duty has a *special responsibility* toward the other party":

> " 'This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution.' "

*Curtis*, 148 Or App at 619 (quoting *Conway*, 324 Or at 240) (emphasis in *Conway*)). Our task, then, is to examine whether the evidence here, viewed most favorably to plaintiff, would permit a jury to find that Sunriver Prep assumed such a heightened duty of care on plaintiff's behalf.

We are persuaded that a jury could so find. Sunriver Prep was not at all like a typical high school; it was, in the words of its president, a "boarding school" that "act[ed] in the parental role" for plaintiff and others who lived in the International House and with homestay parents, whom the school specially approved. The International House contract, which was approved by the school, provided that plaintiff was subject to "[a]ll school rules" and the house parents' supervision not only while on campus but "24 hours a day, 7 days a week." Once King approved plaintiff's move into the Wheeler residence under the homestay program, the homestay agreement vested in the Wheelers a profound level of control over plaintiff's life—understandably, given her youth and the thousands of miles that separated her from her parents. Although there was evidence that Sunriver Prep did not

always enforce strict adherence to the homestay agreement, a jury could reasonably conclude that the agreement, by its very terms, defined the school's "fundamental expectations" and established the homestay parents' power to restrict the student's dating, social activities, and telephone privileges; to enforce curfews; and to set requirements for studying. The agreement included the expectation that homestay parents must know the student's whereabouts at all times and authorized homestay parents to resolve conflicts with the student according to a template that called for the parents' involvement not at the beginning of the conflict but only as a last resort, if all else had failed. If the student required medical care, the homestay parents were authorized to secure it and inform the parents later. And, like the International House contract, the homestay agreement included the proviso that "[a]ll school rules * * * are in effect 24 hours a day, 7 days a week for homestay students."

The agreement is not the only means of defining the parties' relationship; consistently with that agreement, Sunriver Prep's agents *did* in fact exercise independent judgment on plaintiff's behalf. Wheeler took plaintiff to the doctor when she showed signs of anxiety and depression; she made efforts to protect plaintiff from her abusive father in consultation with law enforcement officials; she hospitalized plaintiff when plaintiff disclosed that she was feeling suicidal. King likewise exercised control over plaintiff's important affairs, demanding and securing Kang's signature on medical releases and arranging for counseling appointments that she required plaintiff to attend. Indeed, when a calendaring conflict arose between an appointment that plaintiff had previously arranged and an appointment that King had arranged for her, Goldsmith insisted that the latter appointment took precedence. Finally, when Kang rescinded the medical releases at plaintiff's urging, King immediately expelled plaintiff from school and forbade Wheeler (who had been acting as her "mom") and Lee from providing housing for plaintiff. Had Lee's intervention failed, King, acting as Sunriver Prep's agent, apparently would have required plaintiff to return alone to Korea the very next day.

Under those circumstances, a jury could properly conclude that plaintiff and Sunriver Prep were in a special

relationship—essentially, a surrogate parent relationship in the context of a boarding school—that gave rise to a heightened duty of care beyond the general duty to avoid foreseeable risks of harm.[2] Plaintiff entrusted herself to Sunriver Prep, relied on the school to exercise independent judgment on her behalf—and her efforts, successful and unsuccessful, to retain some independent control over her personal information do not detract from the evidence that the school's agents exercised a significant measure of responsibility and control over some of the most personal matters in her young life.

■ The next question, then, is whether the heightened duty assumed by Sunriver Prep included a specific duty to avoid the infliction of emotional distress. We may uphold the imposition of liability on Sunriver Prep here only if we answer that question affirmatively. *See Rustvold v. Taylor*, 171 Or App 128, 138-39, 14 P3d 675 (2000), *rev dismissed*, 332 Or 305 (2001) (a physician-patient relationship can, but does not necessarily, include a duty to avoid negligent infliction of emotional distress).

We are persuaded that the standard of care applicable to a reasonably prudent boarding school-surrogate parent recognizes the possibility of grave emotional distress as a concern associated with handling a suicidal teenage student in the school's custody and dictates that certain precautions be taken to avoid or minimize such risks. In addition to presenting expert testimony supporting such a standard of care,

---

[2] Sunriver Prep, although disputing the surrogate parent characterization urged by plaintiff, argues that, in any event, the Supreme Court has rejected the proposition that the parent-child relationship warrants special protection from infliction of emotional distress. *See Burnette v. Wahl*, 284 Or 705, 588 P2d 1105 (1978). However, *Burnette* does not assist Sunriver Prep. The policy considerations that underlie the court's reasoning in that case as applied to actual parents and children are not necessarily present in relationships between nonfamily members. For example, the state has a strong interest in maintaining family relationships over the long term, a goal that may be hampered if parents are subject to civil liability for emotionally harmful behavior. Moreover, unlike nonparents in a parental role (such as day care providers), parents do not have the same freedom to choose or leave the relationship or the same ability to protect themselves from liability by purchasing insurance. Additionally, the holding in *Burnette* was justified by the existence of an extensive statutory scheme that addresses emotional harm to children by their parents and provides a comprehensive set of remedies, *id.* at 714-15; the boarding school/homestay student relationship is not subject to a similar remedial scheme.

plaintiff presented evidence of the nature of the relationship, which establishes that guarding against emotional risks was part of the role that Sunriver Prep assumed as surrogate parent. Sunriver Prep reserved to homestay parents the ability to obtain medical care for students in their care and to monitor their behavior and social relationships. The school also reserved to itself the ability to require a homestay student to attend psychological counseling and even to give the school's counseling plans priority over the student's. Wheeler acted as plaintiff's "mom" in attempting to address plaintiff's depression and, later, her suicidal thoughts. And King purported in all respects—though it appears that the jury disbelieved her—to be acting out of concern for plaintiff's emotional well-being. All of this evidence indicates recognition by the school of its duty to protect plaintiff against emotional harm.

Sunriver Prep expresses concern that recognition of a claim here will expose schools to liability every time a student suffers some emotional effect as a result of an expulsion and that this will undermine schools' ability to provide for student safety. Those concerns are overstated. We emphasize that the harm in this instance was caused not merely by the expulsion but also by the manner in which it was conducted, in light of the unique relationship that the school had fostered with plaintiff. Future cases must be judged on their own facts. We are not here concerned with a public high school student disappointed in the school's decision to exclude her from a team, or even with a decision to expel her from school for unacceptable deportment or poor grades. Rather, this case involves a student enrolled in a boarding school that acted in a parental role and that assumed custody of and responsibility for its homestay students every hour of every day. Under the facts of *this* case, viewed in the light most favorable to plaintiff as they must be, we are satisfied that the imposition of liability offends neither good public policy nor binding precedent.

■ Having concluded that plaintiff presented evidence demonstrating a legally protected interest (that is, a special relationship that included a duty to protect against emotional harm), we must address whether the alleged invasion of that interest was of sufficient importance to warrant the award of damages for emotional distress. *Curtis*, 148 Or App

at 620-21. We have held that, where the underlying loss is an economic or property loss that predictably also results in emotional distress, the invasion is not of sufficient importance to warrant an award of damages for emotional distress. *Meyer v. 4-D Insulation Co., Inc.*, 60 Or App 70, 74-75, 652 P2d 852 (1982) (Oregon cases allowing damages for emotional distress all involve "an interference with the person beyond the inconvenience and distress always resulting from interference with property"). For example, we held in *Collver* that the loss of the plaintiff's driving privileges due to the allegedly negligent failure of his insurance broker and carriers to procure auto insurance coverage was not an invasion of sufficient importance to warrant an award of damages for emotional distress; the invaded interest was "chiefly an economic one." *Collver*, 132 Or App at 54-55, 64-66. Likewise in *Hilt*, where the plaintiff's claim for emotional distress damages resulting from her attorney's allegedly negligent counseling was premised on the underlying loss of equity in her home, we concluded that the underlying loss was "solely an economic one" not sufficient to warrant the recovery of emotional distress damages. *Hilt*, 75 Or App at 515; *see also McCulloch v. Price Waterhouse LLP*, 157 Or App 237, 251-52, 971 P2d 414 (1998), *rev den*, 328 Or 365 (1999) (the alleged infringement by the defendant accountants of the plaintiff's interest in trust assets and in having tax returns filed timely was not sufficient to support an award for emotional distress). Such cases recognize that damages for those economic losses adequately compensate for the injury to the interests at issue. *Hilt*, 75 Or App at 515.

That is not so here. Indeed, despite Sunriver Prep's attempt to characterize plaintiff's interests here as "fundamentally economic," it is difficult to envision an economic measure for her damages. Plaintiff did not suffer emotional distress as a secondary consequence of some economic or property loss occasioned by Sunriver Prep's negligence. Viewing the evidence in the light most favorable to plaintiff, as we must, one cannot reasonably conclude (as Sunriver Prep urges us to do) that plaintiff's only damages revolve around not being able to receive the education for which she and her father contracted. Rather, plaintiff confided to her surrogate parent (Wheeler and the officials who took charge of the

school's response) that she had been sexually abused and that she was feeling suicidal, and the evidence supported a finding that her distress was the direct consequence of the school's response to being taken into her confidence. That response included her peremptory expulsion; the school's stated intention, nearly carried out, to return her immediately to Korea where her father, who had raped her three weeks previously, had legal custody of her; her abrupt removal from her homestay residence; and King's refusal to permit Wheeler or Lee to provide housing for plaintiff. Plaintiff has proved an invasion sufficient to support recovery for emotional distress damages under these circumstances.

Sunriver Prep's second assignment of error concerns plaintiff's first claim for relief, in which she asserted that defendant, through its agent, Wheeler, failed to adequately supervise plaintiff during her father's visit to Bend. Sunriver Prep asked the trial court to instruct the jury to apportion fault, pursuant to ORS 31.600(2), between Sunriver Prep and Shin, whom Sunriver Prep had sued as a third-party defendant. Plaintiff opposed that request, arguing that the comparative fault statute does not extend the requirement of apportionment to intentional tortfeasors, and the trial court agreed. The parties renew their arguments on appeal. We agree with the trial court that the statute does not require a fault comparison between negligent and intentional tortfeasors and therefore affirm.

We review such questions of statutory interpretation for errors of law. *Stiles v. Freemotion, Inc.*, 185 Or App 393, 395, 59 P3d 548 (2002), *rev den*, 335 Or 504 (2003). Following the familiar instruction of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993), our "task is to discern the intent of the legislature," beginning by analyzing the statutory text in context. "Context" includes the text of other relevant statutory provisions, *Liberty Northwest Ins. Corp. v. Stapleton*, 192 Or App 312, 318, 84 P3d 1116 (2004), prior versions of the same statute, *Oregonians for Sound Economic Policy v. SAIF*, 187 Or App 621, 635, 69 P3d 742, *rev den*, 336 Or 60 (2003), and Oregon Supreme Court interpretations of the same statutory language, *State v. O'Donnell*, 192 Or App 234, 243-44, 85 P3d 323 (2004).

■   ORS 31.600 provides, in pertinent part:

"(1)   Contributory negligence shall not bar recovery in an action by any person * * * to recover damages for death or injury to person or property if the *fault* attributable to the claimant was not greater than the combined *fault* of all persons specified in subsection (2) of this section, but any damages allowed shall be diminished in the proportion to the percentage of *fault* attributable to the claimant. *This section is not intended to create or abolish any defense.*

"(2)   The trier of fact shall compare the *fault* of the claimant with the *fault* of any party against whom recovery is sought, the *fault* of third party defendants who are liable in tort to the claimant, and the *fault* of any person with whom the claimant has settled. The failure of a claimant to make a direct claim against a third party defendant does not affect the requirement that the *fault* of the third party defendant be considered by the trier of fact under this subsection. Except for persons who have settled with the claimant, there shall be no comparison of *fault* with any person:

"(a)   Who is immune from liability to the claimant;

"(b)   Who is not subject to the jurisdiction of the court; or

"(c)   Who is not subject to action because the claim is barred by a statute of limitation or statute of ultimate repose."

(Emphasis added.)

The context of ORS 31.600 includes ORS 31.605, which provides, in pertinent part:

"(1)   When requested by any party the trier of fact shall answer special questions indicating:

"(a)   The amount of damages to which a party seeking recovery would be entitled, assuming that party not to be at fault.

"(b)   The degree of *fault* of each person specified in ORS 31.600(2). The degree of each person's *fault* so determined shall be expressed as a percentage of the total *fault* attributable to all persons considered by the trier of fact pursuant to ORS 31.600."

(Emphasis added.)

The original version of ORS 31.600, which referred to "negligence" rather than "fault," provides additional context. *See Oregonians for Sound Economic Policy*, 187 Or App at 635. The legislature replaced the word "negligence" with "fault" when the statute was amended in 1975.[3]

Sunriver Prep reads the requirement in ORS 31.600 that "[t]he trier of fact shall compare the fault of the claimant * * * with the fault of third party defendants who are liable in tort to the claimant" to include intentional tortfeasors and cites the change in language from "negligence" to "fault" in 1975 as evidence of a legislative intention to broaden the category of torts to which comparative fault principles applied. The question, then, is whether "fault," as used in ORS 31.600 and ORS 31.605,[4] encompasses intentional torts.

Although the Supreme Court has not addressed that precise question, it has had occasion to consider the meaning of "fault" in the comparative fault statute in light of its legislative history. In *Johnson v. Tilden*, 278 Or 11, 18, 562 P2d 1188 (1977), the court concluded that the 1975 amendments extended comparative fault treatment to actions based on

---

[3] As originally enacted, the statute provided:

"Contributory negligence * * * shall not bar recovery in an action by any person * * * to recover damages for *negligence resulting in death or injury to person or property if such negligence contributing to the injury was not as great as the negligence of the person* against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the *amount of such negligence* attributable to the person recovering."

*Former* ORS 18.470 (1973/74), *renumbered as* ORS 31.600 (2003) (emphasis added).

As amended in 1975, the statute (which is almost identical to the current version of ORS 31.600(1)) provided:

"Contributory negligence shall not bar recovery in an action by any person * * * to recover damages for death or injury to person or property if the *fault attributable to the person seeking recovery* was not *greater than the combined fault of the person or persons* against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the *percentage of fault* attributable to the person recovering."

*Former* ORS 18.470 (1975), *renumbered as* ORS 31.600 (2003) (amendments shown in italics).

[4] ORS 31.605 was enacted in 1975 and was originally numbered as ORS 18.480.

gross negligence. In doing so, the court reviewed the legislative history and found the following statement from then-Representative Frohnmayer in a memorandum to the House Judiciary Committee explaining the intent behind the language change: " 'Apportionment of damages is expressly extended to all actions to recover damages for injury to persons or property in which contributory negligence may properly be asserted as a defense.' " *Johnson*, 278 Or at 17 (quoting Minutes, House Committee on the Judiciary, May 28, 1975, App G). From that, the Supreme Court concluded—consistently with the statute's explicit direction that "[t]his section is not intended to create or abolish any defense"[5]—that the 1975 amendments were intended to include not only actions based on gross negligence, but also "any other actions based on tortious conduct, however described, in which contributory negligence is an appropriate defense." *Johnson*, 278 Or at 17. Accordingly, when the Supreme Court considered the 1975 amendments again in *Sandford v. Chev. Div. Gen. Motors*, 292 Or 590, 595-97, 642 P2d 624 (1982), it concluded that the change in language from "negligence" to "fault" applies to actions for strict product liability, "where the defendants' 'fault' lies in putting a dangerously defective product on the market." In doing so, the court noted that prior law recognized a defense to strict products liability when the injured party had unreasonably proceeded to encounter a known danger from the product defect. *Sandford*, 292 Or at 597.

We return then, to the statutory interpretation question now before us. ORS 31.605(1) provides that, "[w]hen requested by any party the trier of fact shall answer special questions indicating * * * [t]he degree of fault of each person specified in ORS 31.600(2)." ORS 31.600(2) requires the trier of fact to "compare the fault of the claimant" with, among others, "the fault of third party defendants who are liable in tort to the claimant." Although Shin is a "third party defendant liable in tort" to plaintiff, the statute mandates only a comparison of "fault."

---

[5] That language, included in the 1975 amendments, Or Laws 1975, ch 599, § 1, and interpreted by the Supreme Court in *Johnson*, also appears in the current version of the statute. *See* ORS 30.600(1).

■    The Supreme Court's prior interpretation of the comparative fault statute, including the court's reading of the legislative history, guides our interpretation at the first level of textual analysis, as if written into the statute at the time of its enactment. *See Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992). From it we glean that "fault" as used in the 1975 amendments—now codified at ORS 30.600 and ORS 30.605—includes "tortious conduct, however described, in which contributory negligence is an appropriate defense." *Johnson*, 278 Or at 17. Before the adoption of comparative fault, contributory negligence was not a defense to willful or intentional misconduct. *Cook v. Kinzua Pine Mills Co.*, 207 Or 34, 42-43, 293 P2d 717 (1956); *Hampton Tree Farms, Inc.*, 158 Or App at 395. Accordingly, intentional misconduct is not "fault" subject to apportionment within the meaning of ORS 30.600 and ORS 30.605.

Our prior discussion in *Hampton Tree Farms*, though not dispositive, supports that result. There, we held that an intentional tortfeasor could not invoke the comparative fault statute to reduce its liability to a negligent plaintiff, based in part on our recognition that contributory negligence was not a defense to intentional misconduct at common law. *Hampton Tree Farms, Inc.*, 158 Or App at 395. Additionally, we noted that the legislative history on which the Supreme Court based its decision in *Johnson* suggests "an intent to extend comparative fault to all situations in which the plaintiff must prove the defendant's gross negligence; nothing in it indicates an intent to extend it to wilful or intentional misconduct." *Id.* at 394-95. Finally, we noted that such an extension would be "conceptually incoherent":

> "Wilful misconduct * * * is qualitatively different from negligence of any sort. * * * [N]egligence consists of a continuum of fault from simple negligence through gross negligence to recklessness. Wilful misconduct is not on that continuum. It does not involve a mere neglect of responsibility, however serious; to the contrary, it involves a conscious decision to act in a way that risks harm to another. * * * Those things are simply not comparable."[6]

---

[6] Sunriver Prep invokes several other jurisdictions that have reached a different conclusion. Those cases, of course, interpret different statutes with different

*Id.* at 395. Although not dispositive here, the same logic applies equally to apportionment between defendants as between a defendant and a plaintiff.

Sunriver Prep imbues with significance the addition in 1995 of what is now codified as ORS 31.600(2), which includes the directive that "[t]he trier of fact *shall* compare the fault of the claimant with * * * the fault of third party defendants who are liable in tort to the claimant." Or Laws 1995, ch 696, § 3 (emphasis added). According to Sunriver Prep, the 1995 amendments added a comparison requirement that did not exist before. We disagree. Comparison also was required under the pre-1995 statute—limited, as it now is, to a comparison of "fault."[7] Moreover, ORS 31.805(1),[8] which addresses the right of contribution among joint tortfeasors, provides additional context for understanding the 1995 amendments to ORS 31.600. That statute, which was not amended in 1995, refers explicitly to ORS 31.600:

> "The proportional shares of tortfeasors in the entire liability shall be based upon their relative degrees of fault or responsibility. In contribution actions arising out of liability under ORS 31.600, the proportional share of a tortfeasor in the entire liability shall be based upon the tortfeasor's percentage of the common *negligence* of all tortfeasors."

ORS 31.805(1) (emphasis added). If, as Sunriver Prep suggests, the legislature amended ORS 31.600[9] in 1995 with the intention of including intentional misconduct in the comparative fault equation, one would expect it also to have

---

legislative histories. *See generally* Ellen M. Bublick, *The End Game of Tort Reform: Comparative Apportionment and Intentional Torts*, 78 Notre Dame L Rev 355 (2003) (noting that the majority view rejects apportionment between negligent and intentional tortfeasors).

[7] *Former* ORS 18.480(1) (1977), *renumbered as* ORS 31.605(1) (2003), part of the comparative fault scheme before the 1995 amendments, provided that "[w]hen requested by any party the trier of fact shall answer special questions indicating * * * [t]he degree of each party's fault expressed as a percentage of the total fault attributable to all parties represented in the action." Similar language survived the 1995 amendments and is currently codified at ORS 30.605(1).

[8] ORS 31.805 was enacted in 1975 and was originally numbered as ORS 18.445. It was renumbered in 2003. For ease of reference, we refer to the statute by its current numbering.

[9] At the time of the 1995 amendments, ORS 31.600 was numbered as ORS 18.470. For ease of reference, we refer to the statute by its current numbering.

amended ORS 31.805(1) to eliminate its directive that contribution among tortfeasors shall be determined according to the percentage of their common negligence. The retention of the reference to negligence in ORS 31.805(1) suggests that no such change was intended.

We also are not persuaded by Sunriver Prep's contention that enactment of a "several only" liability scheme in 1995 (now codified at ORS 31.610) requires the inclusion of intentional tortfeasors in the statutorily mandated apportionment of liability. ORS 31.610(1) imposes "several only" liability in any civil action arising out of bodily injury, death or property damage, "[e]xcept as otherwise provided in this section." ORS 31.610(2) then provides that, "[i]n any action described in subsection (1) of this section, the court shall determine the award of damages to each claimant in accordance with the percentages of fault determined by the trier of fact under ORS 31.605 * * *." By its terms, then, the several liability requirement applies only to those parties found to be at "fault" within the meaning of ORS 31.605.[10]

Sunriver Prep hearkens to the reasoning of other courts interpreting other statutes to support its view of the proper construction of Oregon's statute, making the policy argument that "penaliz[ing] the negligent tortfeasor" by refusing apportionment of liability with an intentional tortfeasor "not only frustrates the purpose of the statute but violates the common sense notion that a more culpable party should bear the financial burden caused by its intentional act." *Weidenfeller v. Star & Garter*, 2 Cal Rptr 2d 14, 16 (Cal

---

[10] Our view is not altered by the fact that other jurisdictions, interpreting different statutes with different legislative histories, have found apportionment of fault between negligent and intentional tortfeasors to be consistent with the abolition of joint and several liability in favor of a several liability scheme. *See, e.g., Slack v. Farmers Ins. Exchange*, 5 P3d 280, 284-86 (Colo 2000) (holding that Colorado's comparative fault scheme indicates a legislative intent to require apportionment between negligent and intentional tortfeasors and commenting that such a result is consistent with the statutory purpose of eliminating joint and several liability); *Teton County Sheriff's Dept. v. Bassett*, 8 P3d 1079, 1083-84 (Wyo 2000) (drawing similar conclusions in interpreting Wyoming's comparative fault statute). Just because such comparison is "consistent" with the abolition of joint and several liability does not mean that a bar on such comparison is somehow inconsistent with a change to "several only" liability. Such a scheme may reflect a policy of prioritizing full recovery for injured plaintiffs over limiting liability for tortfeasors who are "merely" negligent.

App 1991); *see also Slack v. Farmers Ins. Exchange*, 5 P3d 280, 286-87 (Colo 2000). However, the legislatures in those states did not pass a comparative fault law that was "not intended to create or abolish any defense," as provided in ORS 31.600(1), nor did they pass a contribution law that directed the allocation of liability among tortfeasors according to their common "negligence," as provided in ORS 31.805(1). Those legislatures likewise did not create legislative history similar to the legislative history here.[11]

This case concerns Oregon's comparative fault statute, not the dissimilar comparative fault statutes of other states. The legislature's choice to continue using the word "fault" in the 1995 amendments to ORS 31.600 and ORS 31.605, when Oregon courts had previously interpreted the word (particularly in *Johnson* and *Sandford*), evidences an intent to maintain the interpretation set forth in those cases. *See Lindeman v. State Indus. Acc. Comm.*, 183 Or 245, 254, 192 P2d 732 (1948) (where a case interpreting specific words in a statute was followed by an amendment to the statute that used the same words, it could be presumed that the legislature "intended to adopt the construction which had been placed thereon by the court" in the prior case).

In conclusion, we hold that, when the legislature changed "negligence" to "fault" in the comparative fault statutes in 1975, it intended to extend comparative fault to tortious conduct to which contributory negligence was a valid defense at common law. References to "fault" in ORS 31.600 and related statutes do not encompass intentional conduct to which contributory negligence was not a defense; apportionment of liability between negligent and intentional tortfeasors therefore is not permitted under those statutes. The trial court did not err in refusing to instruct the jury otherwise.

Affirmed.

---

[11] The wide variety of conclusions courts and legislatures in other jurisdictions have come to in addressing whether to compare intentional and negligent tortfeasors is discussed in Bublick, 78 Notre Dame L Rev at 370-86.